407 So.2d 141 (1980)
Arthur James JULIUS, alias,
v.
STATE.
3 Div. 5.
Court of Criminal Appeals of Alabama.
January 22, 1980.
Rehearing Denied February 26, 1980.
*142 George W. Cameron, Jr., Montgomery, for appellant.
Charles A. Graddick, Atty. Gen., Mary Jane LeCroy, Asst. Atty. Gen., for appellee.

On Rehearing
TYSON, Judge.
The application for rehearing in this cause by the State of Alabama is hereby granted, and the original opinion in this cause, issued on December 4, 1979, is hereby withdrawn and held for naught.
Arthur James Julius was charged in a twelve-count indictment under Alabama's Death Penalty Statute, § 13-11-1 through § 13-11-9, Code of Alabama 1975 (Act No. 213, General Acts of Alabama 1975), for "any murder committed while the defendant is under sentence of life imprisonment," or, alternatively, for "any murder committed by a defendant who has been convicted of murder in the first or second degree in the 20 years preceding the crime."[1]
The jury found the defendant "guilty as charged" and fixed punishment at death by electrocution (R. p. 486). Thereafter, the trial court conducted a post-conviction hearing on the aggravating and mitigating circumstances pursuant to § 13-11-2, et seq., Code of Alabama 1975, which resulted in the imposition of the sentence of death by electrocution.[2]
At trial, the State called C. W. Myers, custodian of inmate records for the Alabama Board of Corrections. Mr. Myers testified that, on January 29, 1978, the date of the offense in question, the appellant was an inmate at the Draper Work Release Center. Mr. Myers testified over defense counsel's objection that appellant was serving a life sentence for first degree murder.
*143 E. O. Sanders testified that the deceased, Susie Bell Sanders, was his daughter. On Sunday, January 29, 1978, Mr. Sanders attempted to telephone his daughter sometime in the afternoon. When he repeatedly received a busy signal, Mr. Sanders decided to drive the short distance to his daughter's house on McElvy Street in the southwestern area of Montgomery, Alabama. Earlier that day when Mr. Sanders saw his daughter at her house she had been suffering the effects of a minor cold. Mr. Sanders was uncertain of the precise time when he arrived on the second occasion. Mr. Sanders' best estimate was that it was between 4:30 and 5:00 p. m.
When Mr. Sanders entered his daughter's house with his granddaughter, the deceased's daughter, he found the house in disarray. In one of the rooms, Mr. Sanders found the nude body of his daughter in an inverted position on a sofa, her head on the floor amid large bunches of hair which had been pulled out of her head. Mr. Sanders told his granddaughter to get help from the neighbors as he carried his daughter into the bedroom. Mr. Sanders said his daughter's body was still warm but he could not hear her heartbeat. Mr. Sanders noticed scratches around his daughter's neck and mouth. After partially dressing his daughter, Mr. Sanders called the paramedical squad for help. Mr. Sanders estimated that the paramedics arrived at about 5:20 p. m. Mr. Sanders identified numerous photographs taken by the police at the scene showing various views of the deceased and her house as it was on the date in question.
Following Mr. Sanders' testimony, the state introduced a certified copy of the trial docket sheet from the circuit court of Jefferson County, Alabama showing the appellant's conviction by plea of guilty to a first degree murder charge on June 8, 1972. The state also introduced a copy of the transcript of the said proceedings for the purpose of showing that appellant's constitutional rights were properly safeguarded prior to the court's acceptance of his guilty plea. Both items of evidence were admitted by the trial court over timely defense objection.
Fanny Sanders, mother of the deceased, testified that appellant's mother, one Gussey Byrd, was her half-sister. Thus, she explained, the appellant and the deceased were first cousins. Mrs. Sanders stated that her daughter was employed as a secretary by the Department of Court Management and was a student at Troy State University. Mrs. Sanders testified that Andrew Boykin lived with her daughter and planned to marry her on April 14, 1978. Mrs. Sanders recalled that her daughter sometimes called the appellant Bo-Bo, a nickname. Mrs. Sanders denied ever having sexual intercourse with the appellant. Prior to her daughter's death, Mrs. Sanders last saw the appellant on Sunday, January 22, 1978. Mrs. Sanders identified a photograph of the automobile he was driving on that occasion. The photograph was admitted into evidence.
William Gardner, paramedic with the City of Montgomery, testified that on January 29, 1978, he responded to a call to McElvy Street at 5:21 p. m. Mr. Gardner arrived at Ms. Sanders' house at 5:24 p. m. Upon entering Mr. Gardner found the deceased lying on a bed partially clothed. Efforts to revive Ms. Sanders through use of electrical shock were unsuccessful. Mr. Gardner departed the scene at 5:49 p. m.
Detective Albert Hardy with the Montgomery Police Department arrived on the scene while the paramedics were present. Detective Hardy observed that the house was in complete disarray and that the telephone was pulled out of the wall connection. Detective Hardy identified several photographs taken at the scene.
Everett L. Rich, counselor and security guard at Draper Work Release Center, testified that the appellant was assigned to his facility on the date in question. Mr. Rich identified the daily log kept at Draper Work Release Center showing inmate activity. Mr. Rich verified his signature on an entry showing that the appellant had returned from an eight-hour pass on January 29, 1978, at 7:40 p. m.
*144 Mr. Rich recalled that approximately thirty minutes after the appellant's return, he had a conversation with the appellant. The appellant told Mr. Rich that he had received a telephone call informing him that his first cousin had been killed. The appellant told Mr. Rich that he had been at his cousin's house earlier that day and she was fine when he left.
Willie Clayton, appellant's cousin, testified that on January 29, 1978, he drove to Draper Work Release Center to get the appellant and bring him back to Montgomery for the afternoon. Mr. Clayton recalled that the appellant borrowed Mr. Clayton's automobile leaving at approximately 3:30 p. m. Mr. Clayton identified the photograph of his automobile which had previously been identified by Mrs. Sanders. The top of Mr. Clayton's automobile was a colorfully distinctive, plaid pattern. Pursuant to the district attorney's request, Mr. Clayton parked his automobile in front of the courthouse. It was 6:25 p. m. when appellant returned Mr. Clayton's automobile. At that time, appellant showed Mr. Clayton fifty dollars and a carton of Kool cigarettes he said he obtained from his girl friend. Mr. Clayton identified certain state's exhibits as being the clothing appellant was wearing on the day in question.
Appellant told Mr. Clayton that he had been to a motel with his girl friend where they had sexual intercourse. On the drive back to Draper Work Release Center, the appellant bought some gasoline for Mr. Clayton's automobile. Mr. Clayton confirmed the time of appellant's return to the prison facility as being 7:40 p. m. Mr. Clayton stated that sometimes he called the appellant by the nickname, "Buddy."
Orin Henderson, Willie Clayton's brother-in-law, testified that appellant and Willie Clayton were at his house for dinner on January 29, 1978. Mr. Henderson recalled that his brother-in-law introduced appellant as Buddy. Mr. Clayton had arrived at about 4:00 p. m. while appellant arrived later in Mr. Clayton's automobile at about 6:30 p. m. Mr. Henderson remarked that appellant had a fresh scratch under his eye when he arrived. Mr. Henderson stated that appellant and Mr. Clayton left his house to take appellant back to Draper at about 7:00 p. m.
William Gray, Jr., aged 17, testified that he lived nearby the deceased. Mr. Gray stated that on January 29, 1978, he drove past the deceased's house as he was returning from his sister's place of employment. Mr. Gray recalled that the time when he passed the deceased's house was between 5:10 and 5:15 p. m. His estimate of the time was based on the fact that his sister had to be at work at 5:00 p. m. Mr. Gray also recalled the position of the sun as he was driving.
Mr. Gray described the automobile he saw parked in front of the deceased's house on the day in question as a green four-door Ford automobile. Mr. Gray stated that he could remember the automobile because of the unusual color of the top. Mr. Gray identified a photograph of Mr. Clayton's automobile as being the same automobile he had seen at the deceased's house on the day in question between 5:10 and 5:15 p. m. Mr. Gray stated further that he had seen the appellant driving the same automobile on McElvy Street one week earlier on January 22, 1978. Mr. Gray stated that the same automobile was presently parked near the back door of the courthouse. Following the testimony of Mr. Gray, the jury, under court supervision, was allowed to view Mr. Clayton's automobile for sixty seconds during which time no statements were made to the jury.
When the jury returned, Cliff Dickens testified he managed the Hardee's location where Linda Gray, William Gray's sister, was employed on January 29, 1978. According to company records kept in the regular course of business by Mr. Dickens, Linda Gray's mechanical time clock card indicated that she began working at 5:00 p. m. on January 29, 1978.
Andrew Boykin testified that he was living with the deceased at the time of her death. They were to be married later in the year. On the day of the deceased's death, Mr. Boykin was driving a Trailways *145 bus to Mississippi. Mr. Boykin stated that he left the house at about 11:20 a.m. on the day in question. Mr. Boykin gave the deceased between twenty and thirty dollars before he left. Mr. Boykin recalled seeing the appellant at the deceased's house on January 22, 1978, a week before her death. Mr. Boykin identified his daily logs kept as a matter of course which supported his account of his whereabouts when the killing occurred.
Ralph Mason, general manager of Trailways Bus Company in Montgomery, verified the reliability of Mr. Boykin's daily activity logs. Mr. Mason produced other documentation showing that Mr. Boykin departed Montgomery for Meridian at 12:35 p. m. on January 29, arriving Meridian at 4:30 p. m. Mr. Boykin departed Meridian at 9:45 p. m. the same day arriving Montgomery at 1:30 a. m. the morning of January 30, 1978.
Because of the tardiness of one of the state's witnesses, the parties stipulated that the testimony would show that on January 29, 1978, sunset occurred at 5:16 p. m.
Wayne Suninstein, employed by the Montgomery Police Department as jailer, testified that he searched the appellant prior to his admission to the city jail at 4:40 a. m. on January 30, 1978. Currency totaling thirty dollars was placed in appellant's property envelope for safekeeping by the police prior to his being admitted to jail. Following a showing of the proper predicate, documents and receipts bearing the signatures of the witness, the appellant and a description of the appellant's belongings were admitted into evidence.
John Byers, formerly employed in the city jail as desk officer by the Montgomery Police Department, testified to the authenticity of the documents previously identified by Mr. Suninstein. Mr. Byers stated that inmates of the city jail are allowed to possess up to twenty dollars to purchase personal items such as cigarettes. Mr. Byers stated that once an inmate's belongings are sealed in a property envelope, a search warrant is required in order to authorize subsequent examination of the contents.
Corporal Ed Alford with the Montgomery Police Department testified that he observed appellant while he was being searched prior to his admission to city jail on January 30, 1978. Corporal Alford stated that he saw a twenty dollar bill, a ten dollar bill, some ones and silver removed from appellant. Subsequently, Corporal Alford obtained a search warrant through the Montgomery Municipal Court authorizing him to open appellant's property envelope to examine the contents. Corporal Alford identified the twenty dollar bill and the ten dollar bill he removed from appellant's property envelope prior to their admission into evidence.
Detective D. K. Welch with the Montgomery Police Department testified that he interviewed the appellant after informing him of his Miranda rights. Following the establishment of the proper predicate as to voluntariness, the court admitted and the witness read the appellant's signed written statement into evidence. In his statement, appellant denied killing the deceased.
Truman Bass testified that on January 29, 1978, he was director of the Draper Work Release Center. Mr. Bass testified to the authenticity of certain inmate records kept under his supervision at the Draper facility. These records showed that on January 29, 1978, appellant departed from the Draper facility at 11:50 a. m. returning at 7:40 p. m. Mr. Bass stated that appellant was serving a life sentence. Mr. Bass related the substance of a conversation he had with appellant on January 31, 1978, at police headquarters. This version of appellant's activities on the date in question was substantially the same, with added details, as the version in his signed written statement taken by Detective Welch.
Detective Leo Blankenship with the Montgomery Police Department testified that he interviewed William Gray on January 31, 1978. Detective Blankenship stated that Mr. Gray's statement referred to events of the previous January 22 and January 29.
*146 Gussey Byrd, appellant's mother, testified that Fanny May Sanders, the deceased's mother, was her half-sister. Mrs. Byrd testified that her son told her that on the afternoon in question he was having sexual intercourse with Fanny May Sanders. The state produced a letter written by appellant to his mother in which he discussed his activities with Fanny May Sanders on the date in question. Through the subsequent testimony of Allen Payton, foreman of the grand jury that indicted appellant, the state established the requisite chain of custody for introduction into evidence of the appellant's letter to his mother. The parties stipulated the appellant's authorship of the letter.
Detective Wayman Gant with the Montgomery Police Department testified that he met Andrew Boykin, the deceased's fiance, at the Montgomery Trailways Bus station upon his arrival there early Monday, January 30, 1978. Detective Gant learned that Mr. Boykin smoked Salem Light Long cigarettes.
Detective Gant and two others went to Draper Work Release Center the night of January 29, 1978, to take the appellant into custody. Prior to any interrogation, the appellant was properly advised of his constitutional rights from a standard form used by the Montgomery Police Department. Detective Gant asked the appellant how he had acquired a brownish stain on his shirt sleeve. Appellant responded saying he had cut himself while shaving and used his sleeve to absorb the blood.
Evidence technician T. R. Shanks testified that he processed the scene at the deceased's house. Among the numerous items of evidence seized at the scene, Officer Shanks recalled finding a Kool cigarette butt which was received into evidence. Officer Shanks described numerous other evidentiary items seized at the scene and later given to Toxicologist Thomas Hopen. Officer Shanks later seized appellant's clothing at headquarters at the same time taking samples of appellant's hair and scrapings from his fingernails. Officer Shanks stated that there were no identifiable latent fingerprints recovered at the scene.
Toxicologist Thomas Hopen testified as an expert witness for the state that he received and examined numerous evidentiary items during his investigation of the instant case. Among his numerous findings, Mr. Hopen stated the following: a nine inch long hair recovered from the appellant's underwear had the same characteristics as the deceased's hair; the same hair did not come from the appellant's body; microscopic analysis and chemical comparison of numerous fibers found adhering to appellant's clothing showed characteristics identical to those of fibers taken from the carpets in the deceased's house; analysis of stains on the back of a woman's night gown found at the scene revealed the presence of seminal fluid.
Richard Roper testified that he performed a post-mortem examination on the deceased. Dr. Roper's qualifications as an expert in the field of forensic science were admitted by the defense. External examination of the deceased revealed numerous scratches and abrasions on her neck and chin. The deceased's left eye was swollen and there were lacerations to the inside of her mouth. Dr. Roper identified photographs of the deceased taken by him during his examination.
Results of Dr. Roper's internal examination revealed the presence of seminal fluid in the deceased's mouth, vagina and rectum. Dr. Roper concluded that the cause of death was manual strangulation. Dr. Roper stated that it appeared that the strangulation force was applied by the deceased's killer from behind her. Dr. Roper estimated the time death occurred as being 5:15 p. m. on January 29, 1978.
William Landrum, forensic serologist with the Alabama Department of Toxicology and Criminal Investigation, testified that tests performed on blood samples from both the deceased and the appellant indicated that they had the same blood type. Mr. Landrum's examination of appellant's fingernail scrapings taken by Officer Shanks failed to detect the presence of any tissues or blood. Analysis of seminal fluid *147 stains found on the night gown recovered at the scene indicated that the seminal fluid was produced by someone having the same blood type as the appellant. This particular blood type, AB, is shared by four percent of the population.
Ruth Wheeler, first cousin of the deceased, testified that, on the afternoon in question, sometime between 4:00 and 4:30 p. m., she telephoned the deceased to ask how she was feeling. During the brief telephone conversation, the deceased told the witness that she would call her back because she wanted to talk to her cousin, Bo-Bo. From past conversations, Ms. Wheeler knew that the deceased meant that her cousin, Bo-Bo, was present.
Following the testimony of Ms. Wheeler, the state rested its case. Outside the jury's presence, the court overruled defense counsel's timely motion to exclude the state's evidence grounded upon the state's alleged failure to prove its case. The motion did not refer to specific counts in the indictment.
Willie Clayton, called by the defense, testified that on the afternoon in question when the appellant returned shortly before 7:00 p. m. he did not notice any scratches or bleeding on his face. Mr. Clayton would not state that appellant did not have any scratches, only that he did not notice such.
Appellant took the stand to deny any involvement in the killing of his cousin, Susie Sanders. On cross-examination, the appellant admitted that he was convicted of first degree murder in Birmingham, Alabama on June 9, 1972. The conviction resulted from a plea of guilty.
Appellant stated that, on the afternoon in question, he used Willie Clayton's automobile between 3:30 and 6:25 p. m. Appellant denied going to the deceased's house on the day in question. Appellant detailed his whereabouts during the afternoon in question as follows:
"3:30 Left Orin Henderson's house in Willie Clayton's automobile; drove to Uncle Sol Julius' house.
4:10 After leaving Sol Julius' house, telephoned Fanny May Sanders. Had sex with Fanny May Sanders in Willie Clayton's automobile. Went back to Sol Julius' house. Transported unknown female to Bell Street.
6:25 Returned Willie Clayton's automobile to him."
Appellant admitted that his signed written statement contained lies. According to the appellant, Fanny May Sanders gave him fifty dollars on the afternoon in question. Following appellant's testimony, the defense rested.
Fanny May Sanders was called in rebuttal by the State to testify that she never had sexual intercourse with appellant. Following the trial court's oral charge, the jury retired to consider its verdict.

I
Appellant first asserts that reversible error occurred when the trial court admitted certain documentary evidence which tended to show appellant's prior conviction of first degree murder within the twenty years immediately preceding the instant murder charge.[3]
Appellant asserts that the trial court's error was in the admission into evidence of "certified copies of the trial court's docket sheets with bench notes thereon" as proof of the prior conviction instead of proving such conviction through the introduction of a certified copy of the minute entry showing the conviction in question. Childers v. Holmes, 207 Ala. 382, 92 So. 615 (1922); Palmer v. State, 54 Ala.App. 707, 312 So.2d 399 (1975), and cases cited therein.
The appellant had properly objected to the introduction of this evidence at trial (R. pp. 73-74, and 92).
It should be here noted that, at the time this evidence was offered in the trial court, no reference was made by the assistant district attorney to a local act applicable to Jefferson County, Alabama, being *148 Act No. 1037, Acts of Alabama, 1971 Legislature. This act in pertinent part reads as follows:

"Section 1. That in all counties having a population of 500,000 or more according to the last or any subsequent federal census, all orders and decrees shall be made and entered by Circuit Judges sitting in and for said counties on a sheet or sheets now commonly called trial sheets, that there shall be a trial sheet or sheets for each case docketed in such courts properly identified by the style of the case and a case number.

"Section 2. That after all orders and decrees have been made and entered, in any case, by the Circuit Judge or Judges sitting in and for such counties, the Clerk of the Circuit Courts of such Counties shall file such sheets in numerical order in well bound books labelled "Minute Books" and such judgments or decrees shall have the same force and effect as Minutes of the Circuit Courts of the said counties prior to the passage and approval of this act.

"Section 3. That all laws or parts of laws in conflict with this act are repealed."
The provisions of this act were not cited to this Court in the original brief of the State of Alabama, filed in this cause, nor were the provisions of this statute, a local act, called to the attention of this Court in oral argument of this cause. This matter was first called to our attention on application for rehearing with the District Attorney's Office for Montgomery County joining the Attorney General's Office in brief.
We do here determine that the provisions of this statute are controlling with reference to the admission of these Jefferson County records, and, therefore, no error has been made to appear on this question.

II
Approximately two hours after the jury retired to consider its verdict, the court, in view of the late hour (11:00 p. m.), instructed the bailiff to ask the foreman of the jury to come forward. The court, in the presence of both counsel, but in appellant's absence, told the foreman of the jury to ask the jury to vote on whether or not the jury wished to discontinue its deliberation to retire for the evening. Shortly thereafter, the foreman reported that the jury wished to retire for the evening. The jury was brought into the courtroom, seated in the jury box, instructed to discontinue deliberation and excused in the bailiff's custody. The court requested defense counsel to inform his client, who was upstairs in the jail, that the jury had retired for the evening.
Appellant argues his absence under these circumstances deprived him of his constitutional right to be present during his trial and thereby requires reversal. While we do not condone communication between the court and jury in the defendant's absence, the circumstances in this case do not require reversal. Isom v. State, 51 Ala. App. 114, 283 So.2d 188, cert. denied, 291 Ala. 523, 283 So.2d 194 (1973). The matter of the duration of jury deliberation is within the discretion of the trial court. Martin v. State, 29 Ala.App. 395, 196 So. 753 (1940). If the trial court decides to delegate that decision to the jury, it may do so.

III
Appellant contends that the trial court erred in failing to instruct the jury on the law with regard to circumstantial evidence.
Under Rule 45A, ARAP, appellant's failure to object to the trial court's oral charge does not preclude appellate review as was formerly the case under § 12-22-241, Code of Alabama 1975. Ex parte Jacobs, 371 So.2d 448 (Ala.1979); Watters v. State, 369 So.2d 1272 (Ala.1979).
We think Jacobs, supra, is distinguishable from the instant case in that the court's oral charge in Jacobs was erroneous. In the case at bar, instruction on the law relating to circumstantial evidence was merely omitted from the court's charge and omitted from defense counsel's requested addition to the oral charge.
The colloquy at the conclusion of the trial court's oral charge (Volume III, R. pp. 475-476) is as follows:

*149 "Some written charges have been requested and they are correct statements of the law and I charge you to give the same weight and same effect to the written charges as you do to the oral charge.
"(Court reads written charges.)
"THE COURT: State?
"MR. BENTLEY: The State is satisfied with the Court's charge, Your Honor.
"THE COURT: Defense?
"MR. CAMERON: Judge, would you charge the jury that a reasonable doubt justifying an acquittal of the defendant may arise from a lack of the evidence as well as the evidence?
"THE COURT: Yes, sir. Anything else?
"MR. CAMERON: I believe that is all.
"THE COURT: A reasonable doubt can arise from a lack of the evidence as well as a reasonable doubt arising from the existence of the evidence. You must, in any event, be convinced beyond a reasonable doubt before you can find the defendant guilty in this or any other case. Does that cover it?
"MR. CAMERON: Yes, Your Honor.
"THE COURT: Now, Chief, lay those Exhibits in there. Now, those will be laid on the table and as soon as he does we will allow you to retire and begin your deliberation.
"Now, ladies and gentlemen, you may retire and begin your deliberations."
Additionally, the trial judge gave the following written requested charges (Volume III, R. p. 562):
"DEFENDANT'S CHARGE TWELVE
"The court charges the jury that the jury are instructed that the defendant cannot be convicted, unless the evidence is inconsistent with any reasonable theory of innocence.
"DEFENDANT'S CHARGE THIRTEEN
"The Court charges the jury that the legal presumption of innocence is to be regarded by the jury in every case as a matter of evidence, to the benefit of which the accused is entitled, and, as a matter of evidence, attends the accused until his guilt is, by the evidence placed beyond a reasonable doubt.
"DEFENDANT'S CHARGE TWENTY
"The Court charges the Jury that if you are reasonably satisfied from the evidence in this case that the defendant was at some other place and was not at the home of the deceased at the time she was killed, then under the law, it is your duty to find the defendant not guilty."
In view of the fact that the trial court extended its oral charge at the request of counsel for the appellant, and, in addition, gave written requested charges, which were requested by counsel, we are unwilling to predicate error within the meaning of Rule, 45A, ARAP, on an omission from the trial court's oral charge. Thus, after careful review of the trial court's oral charge in its entirety, we hold that no error adversely affecting the appellant's substantial rights resulted from the omission of oral instruction to the jury on the law with regard to circumstantial evidence. Smith v. State, 262 Ala. 584, 80 So.2d 307 (1955); McPherson v. State, 198 Ala. 5, 73 So. 387 (1916).

IV
Appellant's final contention asserts the unconstitutionality of Alabama's Death Penalty Law. We pretermit discussion of this issue on the basis of rulings by the Alabama Supreme Court contrary to appellant's assertion. Jacobs v. State, Ala.Cr. App., 361 So.2d 607 (1978), affirmed, Ala., 361 So.2d 640 (1978).
The application for rehearing is granted; the judgment of conviction is hereby
AFFIRMED.
DeCARLO and BOOKOUT, JJ., concur.
HARRIS, P. J., and BOWEN, J., dissent with opinion.
 APPENDIX A
STATE OF ALABAMA )( IN THE CIRCUIT COURT OF
VS )( MONTGOMERY COUNTY, ALABAMA
ARTHUR JAMES JULIUS )( CC 78-861-E

*150 ORDER
This Court, having conducted a hearing pursuant to law to determine whether or not the Court will sentence the above defendant to death or to life imprisonment without parole; and the Court having considered the evidence presented at the trial and said sentence hearing; the Court makes the following findings of fact:
The Court first considers the aggravating circumstances:
(a) The present crime committed was especially heinous, atrocious and cruel.
(b) The previous crime committed was heinous, atrocious and cruel.
(c) The present crime falls without question in the category of capital felony.
The Court considers the mitigating circumstances:
(a) That the defendant is a cooperative inmate.
The Court having considered the aggravating circumstances and the mitigating circumstances and after weighing the aggravating and mitigating circumstances, it is the judgment of the Court that the aggravating circumstances far outweigh the mitigating circumstances and that the death penalty as fixed by the jury should be and is hereby accepted.
It is therefore Considered and Adjudged by the Court that Arthur James Julius is guilty of the capital felony charged in the indictment.
It is therefore Ordered and Adjudged that Arthur James Julius shall suffer death by electrocution at any time before the hour of sunrise on the 3rd day of January, 1979, inside the walls of the William C. Holman Unit of the Prison System at Atmore, Alabama, in a room arranged for the purpose of electrocuting convicts sentenced to death by electrocution.
It is therefore further Ordered and Adjudged by the Court that the Warden of William C. Holman Unit of the Prison System at Atmore, or in case of his death, disability, or absence, his deputy, or in the event of the death, disability, or absence of both the Warden and his deputy, the person appointed by the Commissioner of Corrections, at any time before the hour of sunrise, shall on the 3rd day of January, 1979, inside the walls of the William C. Holman Unit of the Prison System at Atmore, in a room arranged for the purpose of electrocuting convicts sentenced to death by electrocution, cause to pass through the body of the said Arthur James Julius, a current of electricity of sufficient intensity to cause his death, and the continuance and application of such current through the body of the said Arthur James Julius, until the said Arthur James Julius be dead.
ORDERED this 24th day of October, 1978.
(s) Richard Emmet
BOWEN, Judge, dissenting.
With all due respect, I adhere to my concurring opinion in Tomlin v. State, Ala. Cr.App., 1 Div. 23 (Ms. November 20, 1979).
"(I)n my opinion, the plain error rule of ARAP, Rule 45A, does apply to instructions which the trial judge failed to mention to the jury. Omissions from the charge may constitute error just as may misstatements or incorrect charges. The absence of certain instructions by their very absence, will be just as `plainly visible' as an incorrect charge."
Rule 45A specifies that this Court "shall notice any plain error or defect in the proceedings under review ... whenever such error has or probably has adversely affected the substantial right of the appellant". This language encompasses plain errors of omission as well as those of commission.
Instructional error may constitute plain error where the trial court has misdirected or failed to instruct the jury on the law of the case. State v. Tilley, 569 S.W.2d 346, 349 (Mo.App.1978). "Certainly, the failure to instruct as to the necessary elements of the offense charged affects the substantial rights of an accused and such error is `plain error'." Findley v. United States, 362 F.2d 921, 922 (10th Cir. 1966). In State v. Searles, 82 N.J.Super. 210, 197 A.2d 384, 386 *151 (1964), it was held that the failure to charge the pertinent rules when there is a claim of alibi was "plain error".
The majority states that "we hold that no error adversely affecting the appellant's substantial rights resulted from the omission of oral instruction to the jury on the law with regard to circumstantial evidence. Smith v. State, 262 Ala. 584, 80 So.2d 307 (1955); McPherson v. State, 198 Ala. 5, 73 So. 387 (1916)." A review of these cases makes it obvious that the majority has made no such determination but has only applied the general rule of those two cases cited that the partial or total failure or omission of a trial court to instruct a jury in its oral charge with reference to principles or rules of law that may be, or even are, involved in the trial, cannot be made the basis for a reviewable question on appeal.
These cases are not applicable because in neither case was the defendant sentenced to death. The plain error doctrine applies only to death penalty cases, Pugh v. State, 355 So.2d 386, 389 (Ala.Cr.App.) cert. denied, Ex parte Pugh, 355 So.2d 392 (Ala.1977), so that even the old plain error rule which was limited to "any testimony that was seriously prejudicial to the rights of the appellant" (emphasis added), Ala. Code 1975, § 12-22-241, did not apply and was not applied in those cases.
The majority is simply "unwilling to predicate (plain) error ... on an omission from the trial court's oral charge". My position is simply that this Court is bound by Rule 45A, which controls over any statute, Ala.Code 1975, § 15-1-1. We should determine whether the defect in the failure of the trial judge to instruct constitutes error and whether such error did or probably did adversely affect the substantial rights of the appellant. A consideration of the existence of error should not be summarily dismissed or disregarded simply because the trial judge failed to instruct rather than erroneously instructing.
To make such a distinction in a case where capital punishment has been imposed is untenable. The majority's position is in total disregard of the basic function of an automatic appeal in a capital case and of insuring that a defendant has received a trial at which his substantial rights have not been adversely affected. For this reason I dissent from the majority opinion.
HARRIS, P. J., joins in this dissent.

On Rehearing
TYSON, Judge.
In addition to the written requested charges shown in Part III of the original opinion of this Court, we also find the following written charge requested by the appellant was also given by the trial judge (Volume III, R. p. 562):
"DEFENDANT'S CHARGE ELEVEN
"The court charges the jury that if there is a probability that the accused is innocent, arising from the evidence, there is a reasonable doubt as to his guilt."
Moreover, a number of Alabama cases have pointed out that where, as here, the evidence is partly circumstantial and partly direct it is not error to refuse to give written charges based upon a consideration of the circumstantial evidence since all the evidence was not circumstantial. Jones and Weatherford v. State, 54 Ala.App. 167, 306 So.2d 33 (1974), affirmed, 293 Ala. 762, 306 So.2d 45 (1975), and authorities therein cited.
Also, the refusal of charges based upon the consideration of circumstantial evidence, where, as here, the evidence is partly circumstantial and partly direct, are properly refused since such charges on circumstantial evidence would not be predicated upon a consideration of all the evidence. Jones and Weatherford, supra; Johnson v. State, 55 Ala.App. 581, 317 So.2d 548 (1975); Lewis v. State, Ala.Cr.App., 372 So.2d 882, cert. denied Ala., 372 So.2d 885 (1979).
OPINION EXTENDED, APPLICATION OVERRULED.
DeCARLO and BOOKOUT, JJ., concur.
HARRIS, P. J., and BOWEN, J., dissent.
NOTES
[1] See § 13-11-2(a)(6) and § 13-11-2(a)(13). Code of Alabama 1975.
[2] See trial court's findings of fact hereinafter attached as Appendix A.
[3] See § 13-11-2(a)(13), Code of Alabama 1975.