The indictment charged James Earnest Ingram with unlawfully breaking into the dwelling of Louise Laughlin with intent to commit a crime therein, to-wit, an assault, and after causing physical injury by striking her, fled therefrom, all in violation of § 13A-7-5, Code of Alabama.
The jury found the appellant "guilty of burglary in the first degree" and following a habitual offender hearing, at which three prior felonies were proven, the trial court set sentence at life without parole.
Louise Laughlin testified that on July 17, 1980, she lived in a first floor apartment at 5015 Court J, Camellia Terrace, in Birmingham. She indicated that she was separated at that point, pending a divorce.
She indicated that she went to sleep and that a dog that stayed with her awakened her shortly after eleven o'clock and that there was a night light on in the room. She stated that she heard some cats and as she looked out of the window, she saw the smoke of a cigarette and saw the head of a male looking through the window from outside. She stated that she called to him and asked what he was doing there. She stated that he was a white male, light skinned with a slight beard, that his hair was brown and fit closely to his neck and ears. She stated that the man replied that he was looking for his wife; that his wife was running around on him and he thought that she was with a man in one of the apartments. She stated that the man was still smoking a cigarette. He was wearing a tee shirt of a beige color with writing on the front. She told the man that his wife was not there and neither was the man that he was looking for and that if he did not leave he could get into trouble. She stated that he then asked for some water to which she replied that, if he desired a drink of water, there was a nearby McDonalds and that he should go there. She also stated to him that he was putting himself in a bad position, *Page 130 
as he could be accused of being a "peeping tom" or worse. She stated the man then laughed at her and told her that she was not going to call the police. He then kicked open the screen and came into her bedroom.
At this point in her testimony, she made a positive in-court identification of the appellant, James Earnest Ingram.
Ms. Laughlin then stated that the appellant told her that she was not going to call the police, that he was an expert marksman and that if she did not do what he told her, he would "blow her head off." She stated that he pulled the hammer back on a pistol, pointed it at her and told her to lie on the bed. He told her to turn over on her stomach. She stated that he struck her and she began screaming. He told her to, "Shut up, bitch" and that he struck her two more times in the face with the gun. He then got on top of her and hit her with his fists and, as she screamed, she could hear people running downstairs and that they rang her doorbell as she called for help. She said that as she heard the people beating on the door, he jumped through the window and left, and that she struggled to her feet, as she was dazed by the blows, and opened the door. She described the appellant as wearing khaki type jeans and that he had attempted to put his hand over her mouth and she noticed that he had left footprints on the sheets as he was barefooted.
She stated that the appellant must have been about 5' 9" tall and that she gave a description to the neighbors, who called Birmingham police. She stated that, after talking with the police, she was then taken to the hospital because she was bleeding from her forehead above her left eye, which cut required several stitches. After treatment at the hospital, on the following day, she met the evidence technician at her apartment and observed him lifting fingerprints from the window and wall where the appellant came in.
Ms. Laughlin also testified that subsequently she had appeared at a police lineup and identified the appellant who was in position three in the lineup. On cross-examination, Ms. Laughlin testified that she identified the appellant both byhis appearance and his speech.
Birmingham Police Officer Ann Ballard stated that she conducted a lineup at police headquarters on September 15, 1980. She stated that she attempted to obtain five white males of approximately the same height and weight and general characteristics, and without pointing out appellant in any way, that Ms. Laughlin identified the appellant after having him repeat certain words which he spoke on the night of the burglary. She stated that a photograph was made of this lineup which showed the appellant in position three.
Ms. Laughlin was recalled and stated she remembered the appellant by his appearance and his speech, and that he had a "Spanish accent." Photographs of the lineup were then placed in evidence.
Donny Todd, Birmingham Evidence Technician, stated that he went to the apartment of Ms. Laughlin at 5015 Court J, on July 17, 1980, and took some photographs and made some fingerprint lifts on the walls and window. He stated that certain areas, because of the texture and general cleanliness or rough finish prevented his being able to make accurate lifts. He stated that he did see a place on the sheets which "could have been" where a person stepped, as it was muddy. He stated that he turned over his fingerprint lifts to Sandra Triplett of that bureau.
Greg Bearden testified that he made certain photographs of the police lineup at police headquarters on September 15, 1980, and identified those.
Sandra Triplett testified that she was the senior fingerprint technician with the Identification Bureau for the City of Birmingham. She stated that at the request of the district attorney she made a comparison with known prints of James Earnest Ingram and that "the results were negative." (R. 141).
Ms. Laughlin was then recalled and testified that the next day she went back to the apartment with her neighbors and that in *Page 131 
her presence, the windows were closed by them.
The appellant's motion to exclude the state's evidence was overruled.
The appellant then presented the testimony of Linda Ingram, his wife, Cindy Ingram, his daughter and Tommy Ingram, his son, each of whom testified that on the night of July 16-17, 1980, appellant was at their home at 3016 Avenue H, Ensley.
 I
Appellant first asserts as error the question propounded to fingerprint technician Sandra Triplett, indicating that the use of the term "known print card for the defendant" indicated evidence of other offenses and as such was error. The record (R. 138) reads as follows:
 "Q. Miss Triplett, let me ask you pursuant to my request did you bring a known print card for the defendant in this case, James Ernest (sic) Ingram?
"A. Yes, I did.
 "Q Do you have the original with you in the courtroom today?
"A. Yes, I do.
 "Q. Just a few minutes ago did you have an occasion to make a xerox copy of the original?
"A. Yes, I did.
 "Q. Have you had an occasion to compare the original to the copy?
"A. Yes, sir.
 "Q. I've got the copy marked State's Exhibit 12 for identification purposes. Does it truly and accurately depict the original as compared to the xerox copy?
"A. Yes, sir."
As may be seen in examining the above colloquy and subsequent pages, nowhere does the record show an objection to this line of questioning. Further, the witness gave a negative answer. (R. 141).
In addition to the above reasons, the mere mention of a known fingerprint card does not clearly indicate a conviction as evidence of other crimes. Many persons are fingerprinted at birth, in later years while attending school or upon joining various organizations, including the military services. Therefore the mere existence of a fingerprint card is not per se "evidence of another offense."
Clearly, no error resulted in the above questioning.
 II
We have carefully examined the testimony of the victim, Ms. Laughlin, and are clear to the conclusion that her testimony shows that her in-court identification was based upon her conversation with and observation of the appellant on the night he broke into her apartment on July 15, 1980, and struck her.
While it is true she stated she recognized him both by his general appearance and his speech, we do not find that her in-court identification was faulty or the product of an unduly suggestive police lineup. Ms. Laughlin testified that she not only conversed with the appellant both outside and inside her apartment for a period of ten to fifteen minutes at close range, but during this period had an opportunity to observe his clothing, height, weight, coloring and hair style.
From the totality of circumstances developed in this record, we find that her testimony was reliable and that her in-court identification of appellant was properly admitted into evidence. The use of voice identification and appearance identification in no way infringed upon appellant's constitutional rights. Donahoo v. State, 371 So.2d 68
(Ala.Cr.App.), cert. denied, Ala. 371 So.2d 74 (1979), and authorities therein cited.
 III
The appellant challenges the use of convictions which occurred prior to the date of the Alabama Habitual Offender Statute, as being an infringement upon appellant's constitutional rights.
This court has upheld the Alabama Habitual Offender Statute in an opinion by Judge DeCarlo in Watson v. State, *Page 132 392 So.2d 1274 (Ala.Cr.App.), cert. denied, Ala., 392 So.2d 1280
(1980). We have also answered the appellant's contentions with reference this statute in additional opinions of this court, particularly, Serritt v. State, 401 So.2d 248 (Ala.Cr.App.), cert. denied, Ala. 401 So.2d 251 (1981) and Smith v. State,401 So.2d 251, (Ala.Cr.App.), cert. denied, Ala. 401 So.2d 257
(1981).
 IV
Appellant also asserts that the admission into evidence at the habitual offender hearing of entries from trial docket sheets within Jefferson County was error in this cause.
This argument overlooks the provisions of Act Number 1037, Acts of Alabama 1971 Legislature, which specifically authorizes the admissions of these Jefferson County records into evidence without having same reduced to being "minute entries." Likewise, the notations entered thereon were also properly considered by the trial court in Jefferson County as proof of the matters contained herein.
This court has specifically proved this practice in Julius v.State, 407 So.2d 141 (Ala.Cr.App.), reversed on other grounds, Ala. 407 So.2d 152 (1980).
We have carefully considered each argument of the appellant and find same to be without merit. This record is free of error.
The judgment of the trial court is therefore due to be, and is hereby affirmed.
AFFIRMED.
All the Judges concur. *Page 455