J.B. Hubbard, alias Billy Hubbard, alias Barney Hubbard, appellant, was first indicted February 18, 1977, in a two-count indictment under the Alabama Death Penalty Act relating to "[a]ny murder committed by a defendant who has been convicted of murder in the first or second degree in the 20 years preceding the crime." Code of Alabama 1975, § 13-11-2(a)(13). Count One charged first degree murder with the prior conviction, and Count Two charged second degree murder with the prior conviction. *Page 1207 
Omitting its formal parts, the indictment read as follows:
 "I. The Grand Jury of said County charge that before the finding of this Indictment J.B. HUBBARD, alias JAMES BILLY HUBBARD, alias JOHN BARNEY HUBBARD, whose name is otherwise unknown to the Grand Jury, unlawfully and with malice aforethought, killed Lillian Montgomery, on to-wit: January 10, 1977, by shooting her with a pistol, and the Grand Jury further charge that at the time said killing was perpetrated, the said J.B. HUBBARD, alias JAMES BILLY HUBBARD, alias JOHN BARNEY HUBBARD had been convicted of murder in the second degree in the preceding twenty (20) years, on to-wit: October 10, 1957.
 "II. The Grand Jury of said County further charge that before the finding of this Indictment J.B. HUBBARD, alias JAMES BILLY HUBBARD, alias JOHN BARNEY HUBBARD, whose name is otherwise unknown to the Grand Jury, unlawfully and with malice aforethought killed Lillian Montgomery, on to-wit: January 10, 1977, by shooting her with a pistol, but without premeditation or deliberation, and the Grand Jury further charge that at the time said killing was perpetrated, the said J.B. HUBBARD, alias JAMES BILLY HUBBARD, alias JOHN BARNEY HUBBARD had been convicted of murder in the second degree in the preceding twenty (20) years, on to-wit: October 10, 1957."
Appellant was duly arraigned and he pleaded not guilty. A jury found him "guilty of murder in the first degree with aggravating circumstances as charged in Count One of the indictment and fix his punishment at death." After a separate sentencing hearing, the trial court accepted the jury's recommendation and sentenced appellant to death. On appeal this court remanded the case to the trial court with instructions that the lower court's order be extended to include findings of fact from the trial and the mitigating circumstances, if any, considered as required by statute. After a proper return to remand was filed, we affirmed the judgment of conviction.Hubbard v. State, 382 So.2d 577 (Ala.Cr.App. 1979). Affirmance by the supreme court of Alabama followed. Hubbard v. State,382 So.2d 597 (Ala. 1980). Subsequently, the supreme court reversed the judgment of this court and remanded the cause to this court on the authority of Beck v. Alabama, 447 U.S. 625,100 S.Ct. 2382, 65 L.Ed.2d 392 (1980); Beck v. State, 396 So.2d 645
(Ala. 1980); Ritter v. State, 403 So.2d 154 (Ala. 1981); andReed v. State, 407 So.2d 162 (Ala. 1981). Hubbard v. State,405 So.2d 695 (Ala. 1981). Pursuant to the order of the supreme court, we reversed and remanded the case to the trial court on October 6, 1981. Hubbard v. State, 405 So.2d 695
(Ala.Cr.App. 1981).
The instant appeal is from appellant's second trial on the same two-count indictment, wherein he was convicted again for the same capital offense. § 13-11-2(a)(13).[1] The second trial was conducted in accordance with the bifurcated procedures outlined in Beck v. State, supra. In the first trial and on appeal, appellant was represented by the public defender of Tuscaloosa County, and on his second trial, he was represented by two appointed attorneys who are experienced and able members of the bar. The same two appointed attorneys represent him on this appeal. As in the first trial, the jury found appellant guilty of "murder in the first degree with aggravating circumstances as charged in Count One of the indictment," and, after a separate sentencing hearing, fixed his punishment at death. The trial court then held a second sentencing hearing on aggravating and mitigating circumstances, and *Page 1208 
found the existence of three aggravating circumstances and no mitigating circumstances. The trial court weighed the aggravating circumstances, while noting the absence of mitigating circumstances, and on May 14, 1982, sentenced appellant to death, thereby accepting the death penalty as recommended by the jury. It is from this second conviction and sentence that appellant now prosecutes this appeal.
As alleged in his capital indictment, appellant was previously convicted of murder in the second degree in Tuscaloosa County on October 10, 1957, for the killing of Carl Dockery, and was sentenced to fifty years in the penitentiary. Receiving credit for "good time," he completed serving his sentence, and was released from prison in October 1976. Shortly after his release, he began living with the victim in the instant case, Lillian Montgomery, at her house and adjoining store near Tuscaloosa.
On January 10, 1977, at approximately 8:15 a.m., an ambulance, manned by attendants David Freeman and Ricky Lee, was dispatched to the combination residence-store of the victim, Lillian Montgomery, as a result of a reported "suicide." Appellant had called the telephone operator for assistance; the operator had called the police at appellant's request; and the police called for the ambulance. Upon the arrival of the ambulance at the scene, some ten minutes later, the attendants saw appellant in the open doorway motioning for them to come inside. The attendants entered the residence and found the body of Lillian Montgomery lying in a pool of blood on the kitchen floor. Appellant stated to David Freeman, when asked if he had moved anything, that he had "carried the gun upstairs," whereupon the attendants and appellant went outside to the ambulance, locking the door behind them.
About 8:53 a.m., Tuscaloosa Police Officers Jack Manley and Charles Stephens arrived at the scene. Officer Manley was informed that the residence was locked, at which time he was given the door key by appellant. Officers Manley and Stephens entered the kitchen and saw that Lillian Montgomery was dead and had apparently been shot more than once. Upon seeing the condition of the body, the officers went back to their patrol car and radioed for a member of the homicide unit and the coroner to come to the scene.
While waiting on the homicide detective and the coroner to arrive, Officer Manley asked appellant what happened. Appellant told Manley that he and Ms. Montgomery had been arguing the night before and that the argument had continued that morning. He stated that about 7:00 a.m., Ms. Montgomery went downstairs and that he heard two shots. Manley asked appellant the whereabouts of the gun, and appellant stated that the gun was on his person. Manley then searched appellant's person and found a .38 caliber pistol, a partial box of .38 caliber ammunition, and a half-pint bottle containing whiskey. At this point, Manley gave appellant Miranda warnings by reading from a card and placed him in the patrol car. Appellant had obviously been drinking, but the witnesses who observed him testified that he was not intoxicated.
Sergeant Dempsey Marcum, the homicide detective, arrived at the scene at approximately 9:15 a.m. While sitting in the patrol car, appellant showed Officer Stephens his billfold, which contained an undetermined amount of money, and stated, "I'm not a bum."
Manley gave Marcum the items he had seized from appellant. Marcum checked the gun and found it to be fully loaded. Marcum entered the residence, with coroner Earl Mitchell and state toxicologist Jim Britton, who in the meantime had arrived at the scene. Upon entry, Marcum observed the body and noted that the kitchen trash can had been overturned and garbage scattered. The victim was clutching a partial set of dentures in her right hand, and a portion of a denture which appeared to be broken lay on the floor near the body. The victim was lying on the kitchen floor in a pool of blood. One mutilated, spent bullet, was found on the kitchen stove, and two spent .38 caliber shell casings were found *Page 1209 
in a wastepaper basket in the upstairs bedroom.
An autopsy performed later on the same day disclosed that the victim had been shot three times. Upon learning this, Marcum returned to the victim's residence and recovered a third .38 caliber spent shell casing from the wastepaper basket in the upstairs bedroom. The autopsy revealed that one bullet entered the left shoulder of the victim, passing from the victim's left to her right at an angle of approximately fifty degrees from the front plane and approximately twenty degrees downward, exiting behind the left shoulder. Another bullet entered the victim's mouth, passing to her right at an angle of thirty-five degrees from the front plane and upward at an angle of two degrees, exiting beneath her right ear. This shot furrowed or cut the victim's tongue, and shattered her jaw, as well as one of her dentures, leaving five or six pieces of the denture lodged in her throat. It damaged large blood vessels and caused severe bleeding of from two to three pints of blood. The pathologist testified that in his opinion, within a reasonable medical certainty, the victim would have been unable to articulate or speak after this wound to the mouth. He stated, as follows: "I don't think anyone would be able to articulate words with the injury that I have described. . . . She could not be able to talk so that she could be understood." A third bullet entered just above the left eyebrow, passing through the brain from the victim's left to her right at an angle of approximately thirty degrees from the front plane and parallel with the horizontal plane, lodging in the lower right rear of the skull. This wound was the cause of death. Death resulted practically instantaneously from the shot that penetrated her brain, and her heart would have stopped beating in a matter of approximately two seconds. The bullet was recovered from the skull. The pathologist further testified, "Within a reasonable medical probability, she was shot in the mouth before she was shot in the brain." This opinion was based upon the observation that most of the blood which flowed from the victim came as a result of the shot in the mouth and that, while she was bleeding, her heart had to be pumping.
It was determined by a firearms expert that the bullet recovered from the victim's skull and the three spent shell casings found in the wastepaper basket in the upstairs bedroom were fired by the pistol taken from the person of appellant. The spent bullet found in the kitchen was so mutilated that comparisons were impossible. An examination of the victim's face showed powder burns or "stifling" on her face. Pattern tests were conducted by the State toxicologist and it was his opinion that the three shots were fired from a distance of no closer than fifteen inches and possibly as far away as thirty-nine inches. The victim was right-handed. Appellant and the victim were apparently alone in the house at the time of the shooting. An alcohol blood test performed at the time of the autopsy disclosed that the deceased had an alcohol blood content of .11 percent.
Several hours after the shooting, appellant made a statement to Marcum at police headquarters concerning the incident. Prior to giving this statement, appellant was again advised of hisMiranda rights. After being so advised, he signed a waiver of rights form. The waiver contained a statement that appellant understood his rights, understood what he was doing, did not want a lawyer, and desired to make a statement and answer questions, and acknowledged that no promises had been made to him and no threats, pressure, or coercion of any kind had been used against him. Marcum wrote the statement as it was made by appellant, and appellant signed it after reading it and having it read to him by Marcum. The statement was read into the record by Marcum at trial, and is as follows:
 "All right, this statement was taken at the Tuscaloosa County Homicide Office on 1614 26th Avenue at 11:35 a.m. on January 10, 1977. Investigator Shirley Fields was present there in the office. 'Approximately about two or three a.m. *Page 1210 
this morning I went downstairs to the store and got me a half pint of Kentucky corn whiskey and drank most of the half pint. After I went back upstairs, Lillian said she had a headache and that she wanted something to drink to see if she could stop her headache. I asked her what she wanted to drink and she said get her a pint of that J.W. Dant and I went downstairs to the store and got her some ice and a Coke and brought it back up to her. She mixed it and she mixed it in a large glass and drank it. I asked her if she was feeling any better. I was laying on the other side of the bed from her. She said, "I'm going to fix me another one." I'd already drank enough and was settled enough that I was fixing to doze back off to sleep. Before she had the drink, she said she wanted to go where her mother was. I said, "What are you talking about, Sugar?", and she said she had so many debts to pay that she just wanted to get out of her misery. I was just dozing when she got up. I didn't see her with the pistol. But she keeps it under her pillow. She went downstairs and I heard two shots. I went downstairs and saw her laying in the floor. I asked her, "What in the world have you done?", and she said, "I just wanted to leave and get out of the way." The last thing she said was to tell me for me and Jimmy and Johnny to take care of what she had and said, "You tell Jimmy and Johnny I want you to have my car." She then just passed out and then I went back upstairs and looked in a book and got Mildred's phone number and then I called Mildred on the upstairs phone. Mildred told me to call the ambulance and the police. Then I called my mother, Mrs. Benny Hubbard, at the rest home in Northport and I told her what Lillian had done. Mother said, "Well, call the ambulance or call somebody." I hung up the phone, then I called Nettie at the bar at the Old Southern Dairy where that lounge is there. I told Nettie what Lillie had done and asked her what I had ought to do. She said, "Call a doctor or ambulance," that she couldn't come down there. Then I called the operator and she told me to call the police headquarters and she dialed them for me. I told her it was an emergency, the police department answered and said they would send the ambulance right on out there. When I saw Lillian, the pistol was under her left hand. I took the pistol out from under her left hand and carried it back upstairs and took two empty shells out of it and put two more bullets in it. I stuck the pistol in my pocket and was fixing to go hide it. I put the box of shells in my pocket and came downstairs. I believe the police got the pistol off me. I put the two empty shells in a trash can upstairs. The police brought me to the homicide office. This is my true and correct statement.' Signed James B. Hubbard."
Shortly after appellant made the above statement, he was "booked" into the county jail, and when his personal possessions were inventoried, it was discovered that he had the victim's gold wrist watch on his person. The wristband of the watch was broken. The watch contained diamonds and was valued at approximately $400. The victim's son testified that the watch had been a Christmas gift from him to his mother; that she prized the watch highly and always wore it; and that when she broke it, which she occasionally did, she would immediately have it repaired. Appellant also had in his possession checks totaling $230. Two of these checks were in amounts of $5 each, were payable to "cash," and contained no endorsement. One check in the amount of $45 was payable to the victim and was not endorsed. One check in the amount of $175 was payable to the victim and was endorsed by general endorsement. This check was from Mrs. Stephanie Gravey and was for a rent payment on a house jointly owned by the victim and her son, Jimmy Montgomery. It was the practice of the victim to collect these monthly rent payment, make the monthly mortgage payments due on the house, pay the expenses of upkeep, and at the end of the year divide the profit with *Page 1211 
her son. Appellant also had $260 in currency and $12.22 in change on his person. The change contained twenty-two pennies. Jimmy Montgomery testified that he was familiar with his mother's business and that she usually kept cash and change in the store cash register. Shortly after the shooting, he checked the cash register and it was empty. He further testified that during the time appellant had been living with his mother, she had spent approximately $10,000 on appellant, which included feeding and clothing him. The photographs of the victim's body, taken shortly after the shooting and before the body was disturbed, show two rings on one of her fingers. Her son testified that it was impossible for his mother to remove the rings from her finger. When the watch, checks and money were taken from appellant at the jail, he stated that the victim told him after she was shot that she wanted him to have her watch, money, and "valuables."
Upon conclusion of the State's case in chief, appellant moved to exclude the State's evidence pertaining to the prior conviction of October 10, 1957, for murder in the second degree. The motion was overruled.
Appellant did not testify in his own behalf. It is apparent from the arguments of defense counsel, cross-examination of the State's witnesses, and the testimony of the defense witnesses, that appellant's defense was based upon the alibi that he was upstairs when Ms. Montgomery was shot in the downstairs kitchen. The thrust of his defense was that Ms. Montgomery committed suicide. Appellant called three witnesses in his behalf: Eugene Shultz, Robert A. Gooden, and Mildred Burgin. Gooden testified that Ms. Montgomery called him between 4:00 a.m. and 5:00 a.m. on the morning of the shooting and asked him to help start her automobile. He tried but failed. He saw both Ms. Montgomery and appellant and he testified that they did not appear to be having any argument. Shultz, who lived nearby, testified that he was asked by appellant around 6:00 a.m. to help start the automobile. He tried and failed. He stated that it did not appear that they were having an argument, and that when they went back into the house, they were "arm and arm." Burgin testified that she was a friend of the victim and had visited her about a week prior to her death. She stated that she carried the victim to the hospital on that occasion, and observed the victim give appellant $1,100. She also testified that the victim complained about bills the appellant was "running up." She stated that, on the morning of the shooting, appellant called her on the telephone and told her that Ms. Montgomery had shot herself and stated, "I think she's down there bleeding to death." Burgin told appellant to call an ambulance.
Eight issues are raised by appellant on appeal. We address them in the order presented in appellant's brief.
 I
Appellant first contends that the State's use of his 1957 murder conviction as the aggravation element of the capital charge violated his Sixth and Fourteenth Amendment rights due to ineffective assistance of counsel in the 1957 proceedings. He bases his claim of ineffective assistance of counsel on the following allegations: (1) His attorney was laboring under a severe conflict of interest, and (2) he was denied an appeal due to his poverty and his attorney's failure to advise him of his right to a free transcript as an indigent. This issue was presented to the trial court by motions to suppress the evidence, motion to quash the indictment, and timely objections to the evidence. At the hearing on the pre-trial motions, appellant introduced the entire record and transcript of his first trial in 1977, i.e., his first trial arising out of the killing of Ms. Montgomery, to support his contentions.
We find that the precise matters raised by appellant in this contention were raised in that first trial and the first appeal from it. Hubbard, 382 So.2d at 581-86. This court considered this issue in that appeal and in affirming that conviction, we specifically held that appellant's attorney in the *Page 1212 
1957 proceedings did not have a conflict of interest,id. at 583, and that the attorney's assistance was not constitutionally ineffective due to his failure to inform appellant of his right to a free transcript on appeal. Id. at 586. In affirming the first judgment of conviction, the supreme court agreed with the reasoning of this court "on all issues."Hubbard, 382 So.2d at 597.
We note that this precise issue had been raised by petitions for writs of error coram nobis in 1962 and 1968, and that after full hearings on those petitions, the issue was decided adversely to appellant. For a detailed discussion of those proceedings, see Hubbard, 382 So.2d at 581-82. A portion of the transcripts from the coram nobis hearings is contained in the record on this appeal. Appellant did not appeal from the adverse ruling on the first coram nobis petition. He did appeal from the adverse ruling on the second, and the judgment was affirmed by this court, without opinion, on June 16, 1970. Id.
at 582-83.
In addressing this issue on the first appeal, we stated:
"Competency of 1957 Trial Counsel
 "The defendant was convicted for murder in the second degree in 1957. The essence of the claim of incompetent counsel is that trial counsel, Hon. James Marshall, represented both the defendant and his father-in-law, Divid Hubbard, who also had been indicted for the same murder. Although Divid was an eye-witness to the shooting in which the defendant claimed self-defense, he was not called to testify in the defendant's behalf.
". . .
 "The appellant's argument that '[t]he refusal of Mr. Marshall to allow the co-defendant to testify, regardless of what he might have said, coupled with the co-defendant's subsequent acquittal, show that J.B. Hubbard's defense was neglected for that of his co-defendant' is totally lacking in merit. '[I]n some cases multiple defendants can appropriately be represented by one attorney.' Holloway v. Arkansas, 435 U.S. 475, 98 S.Ct. 1173, 1178 [55 L.Ed.2d 426] . . . (1978). Joint representation is not per se violative of constitutional guarantees of effective assistance of counsel. Holloway, 98 S.Ct. at 1178. 'The mere fact that an attorney represents multiple defendants does not establish ineffective assistance. Actual prejudice must be shown.' Haggard v. State, 550 F.2d 1019 (5th Cir. 1977). However it is clear that a defendant's Sixth Amendment right to the effective assistance of counsel may be denied where one attorney represents two co-defendants whose interests are in conflict. Glasser v. United States, 315 U.S. 60
[62 S.Ct. 457, 86 L.Ed. 680], . . . (1942).
 "Here any suspicion which may have surrounded Attorney Marshall's representation of two co-defendants has been erased by the evidence and testimony. We conclude and the record fully supports our finding that Attorney Marshall had no conflict of interest in representing both the defendant and a co-defendant and that the defendant was represented by competent counsel at his trial for murder in 1957.
"Competency of Counsel on Appeal
 "The defendant was convicted for second degree murder on October 10, 1957. His appeal was dismissed on November 18, 1957. . . .
". . .
 "The defendant's argument that the mere failure of retained counsel to advise an appellant who alleges he was indigent at the time of his conviction of his right to appeal in forma pauperis constitutes incompetence and a violation of the defendant's constitutional rights as a matter of law has been rejected by the Fifth Circuit Court of Appeals. Langford v. Alabama, 422 F.2d 760 (1969) [cert. denied, 400 U.S. 851
(91 S.Ct. 69, 27 L.Ed.2d 88) (1970)]; Fitzgerald v. Estelle, 505 F.2d 1334 (1974) [cert. denied, 422 U.S. 1011 (95 S.Ct. 2636, 45 L.Ed.2d 675) (1975)]. Counsel's effectiveness must be judged by the 'norms of representation prevailing at the time of counsel's action.' Bonds v. Wainwright, 579 F.2d 317 (5th Cir. 1978). Even as late as 1961, the Supreme *Page 1213 
Court of Alabama expressed uncertainty regarding the import of Griffin v. Illinois [351 U.S. 12
(76 S.Ct. 585, 100 L.Ed. 891) (1956)], and refused to grant an appellant a free transcript of his trial. In dismissing the appeal because the record was not timely filed the Court noted:
 " 'We, of course, are familiar with the case of Griffin v. People of State of Illinois, 351 U.S. 12 (76 S.Ct. 585, 100 L.Ed. 891) . . ., but are not sure of the exact meaning of the sum total of the opinions in the case or their impact upon such a state as Alabama, which was no department or institution with funds from which this Court or any other court could order payment of the expenses of the transcript of the evidence for the appellant. Perhaps Illinois had such a statutory system whereby the Supreme Court of the United States could justify its judgment in ordering the Supreme Court of Illinois to have a transcript prepared for defendant Griffin. But Alabama has no such statute and there is no fund in any department of the state from which such expenses can be paid. Of consequence of which we can not, and will not, order anyone to prepare a transcript of the evidence for this appellant.'
 "Bland v. State, 272 Ala. 215, 130 So.2d 385
(1961).
 "In 1961 the Alabama Legislature formally responded to the rights announced in Griffin with the passage of what is now Sections 12-22-190 to 12-22-201, Code 1975, providing a record on appeal for indigents. A search of the official case reports of this state reveals no instance where an appellant was provided a free transcript of his trial before the passage of this act.
 "In view of the attitude of the Alabama Supreme Court to Griffin v. Illinois, supra, as expressed in Bland, supra, we do not think that Attorney Marshall's failure to advise the defendant of his right to a free transcript on appeal constituted ineffective assistance of counsel.
 "We further note that in the order and judgment of the circuit court entered on February 15, 1963, in the coram nobis hearing, Judge Warren made the following finding of facts with regard to the dismissal of the defendant's appeal.
 " 'The petitioner, J.B. Hubbard, testified in his own behalf and sought to show . . . that the attorney caused an appeal by the petitioner to be dismissed by the petitioner by mistake or inadvertence by not making it clear to petitioner what he was signing or doing and the consequences of his action.'
" '. . .
 " 'Also called as a witness in this cause was Hon. James Marshall, attorney for the petitioner in the original case. Petitioner sought to show by this witness . . . that he caused the petitioner's appeal to be dismissed without the petitioner being sufficiently apprised of his action to know clearly what he was doing by his action of dismissal.
 " 'The State of Alabama sought to prove by Hon. James Marshall that the petitioner was well and adequately represented by his attorney in the defense of a senseless and aggravated murder under circumstances which allowed for very little defense; . . . and, that the petitioner asked that the appeal be dismissed and that the petitioner well and clearly understood that the appeal was being dismissed; and, that in his judgment, there was no aspect of the original trial which would have been sufficient ground for reversal of the original case.'
". . .
 " 'The Court finds further that when the petitioner signed his name to a dismissal of his appeal, he clearly and well understood what he was doing.'
". . .
 "Based on the above, we find that the defendant was not denied effective assistance of counsel at trial or on appeal of his 1957 conviction for second degree *Page 1214 
murder. Therefore his 1957 conviction for second degree murder is valid and was properly admitted into evidence in his trial in 1977."
Hubbard, 382 So.2d at 581-86 (emphasis in original).
At trial, appellant essentially relied upon the same evidence presented at the first trial to support his contention of inadequate assistance of counsel. No new evidence was presented in the instant case which would cause us to change our opinion heretofore rendered on this issue.
It is interesting to note that evidence presented during the sentencing hearing in the instant case shows that appellant had in 1957 confessed to the murder of Dockery, and told how he and Divid Hubbard had conspired to kill Dockery, as well as another person. At his trial in 1957, Hubbard recanted his confession, claiming that he did not remember giving it and that it was untrue. After his conviction, he told the district attorney that the confession was true and that he had lied during his trial. He offered to cooperate with the State in prosecuting Divid Hubbard and, in fact, testified against him.
Appellant urges us in brief to adopt the "reasonably effective assistance" standard for gauging effective assistance of counsel in this case. Appellant's brief was filed prior to the decision of the United States Supreme Court inStrickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052,2064, 80 L.Ed.2d 674 (1984), which holds that "the proper standard for attorney performance is that of reasonably effective assistance." We have adopted the standard set forth in Strickland v. Washington, see, e.g., Haynes v. State,461 So.2d 869 (Ala.Cr.App. 1984); Daniel v. State, 459 So.2d 948
(Ala.Cr.App.), aff'd, 459 So.2d 948 (Ala. 1984), cert. denied,471 U.S. 1009, 105 S.Ct. 1878, 85 L.Ed.2d 170 (1985), and we review this case under that standard. Based upon our review, we find that appellant was well represented in his 1957 trial and post-trial proceedings by constitutionally adequate and skilled counsel. These findings are fully borne out by the record. Appellant has failed to meet the burden of proof required to sustain his allegation of ineffective assistance of counsel. It is apparent that this court applied this standard in reviewing this issue on the first appeal. We stated:
 "Thus it is clear that establishing the denial of the Sixth Amendment right to counsel where the defendant has retained counsel requires a showing either that counsel performed so poorly as to render the proceedings fundamentally unfair, or that counsel's conduct fell short of reasonably effective assistance and some responsible government official connected with the criminal proceeding, who could have remedied the conduct, failed in his duty to accord justice to the accused. [Citations omitted.] Neither requirement has been satisfied in the case under review."
Hubbard, 382 So.2d at 585 (emphasis in original).
We find that appellant was not denied effective assistance of counsel in his 1957 proceedings. Evidence of the 1957 conviction for murder in the second degree was properly admitted into evidence at the trial of the instant case, and the rulings of the trial court denying appellant's motions and its rulings on the admissibility of the evidence of the prior conviction were proper. Thus, we reaffirm and adopt our prior holding on this issue.
 II
Appellant next contends that the trial court erred to reversal in overruling his motion to quash the indictment. He argues that the allegation in the indictment of his prior conviction for murder in the second degree so prejudiced him before the jury that it denied him a fair and impartial trial in violation of his due process rights. He further argues that the prejudice was enhanced by introduction of evidence of the prior conviction during the guilt phase of the trial. In support of his due process argument, he argues that the allegation of a prior conviction is unnecessary to the State's case. He also asserts that consideration of the prior conviction as an element *Page 1215 
of the capital offense, and as a factor in sentencing, violated his constitutional protection against double jeopardy. These arguments were rejected by this court on the first appeal,Hubbard, 382 So.2d at 590-91, and the Alabama supreme court agreed with our decision and our reasons therefor. Hubbard, 382 So.2d at 597.
As we recognized in Hubbard, the Alabama Death Penalty Statute requires that the aggravating circumstances be alleged in the indictment when the death penalty is sought. §§ 13-11-1 and -2. The obvious purpose of this requirement is to ensure that the accused is fully advised and informed of the nature and extent of the offense for which he stands charged. Arthurv. State, 472 So.2d 650 (Ala.Cr.App. 1984), rev'd on other grounds, 472 So.2d 665 (Ala. 1985); Julius v. State,407 So.2d 141 (Ala.Cr.App. 1980), rev'd on other grounds, 407 So.2d 152
(Ala. 1981); Wilson v. State, 371 So.2d 932 (Ala.Cr.App. 1978), aff'd, 371 So.2d 943 (Ala. 1979), vacated on other grounds,448 U.S. 903, 100 S.Ct. 3042, 65 L.Ed.2d 1133 (1980), rev'd on other grounds, 405 So.2d 696 (Ala. 1981). The aggravating circumstance is a statutory element of the crime which must be alleged and proven. The jury must find the existence of the aggravating circumstance even though the enhanced punishment is left to be imposed by the trial judge. Arthur v. State, supra;Hubbard v. State, supra; Wilson v. State, supra.
Appellant suggests that we adopt an approach whereby the prior conviction would be omitted from the indictment, withheld from the jury during the guilt phase, and considered only at the sentencing phase of the trial. To this suggestion, we quote what the Alabama Supreme Court stated when addressing a similar suggestion in Williams v. State, 239 Ala. 296, 297, 195 So. 213
(1940): "This suggestion should be addressed to the Legislature rather than the courts." The United States Supreme Court, in considering a similar issue, held in Spencer v. Texas,385 U.S. 554, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967), that the Texas procedure for enforcing its habitual criminal statute was not rendered unconstitutional under the due process clause because of the possibility of some collateral prejudice to the defendant. By that Texas procedure, prior offenses were alleged in the indictment and proof respecting past convictions was introduced with a charge by the trial court that such prior convictions were not to be taken into account in assessing a defendant's guilt or innocence under the current indictment. The Supreme Court also held in Spencer v. Texas, in reference to a suggestion that a two-stage jury trial would be preferable, that the due process clause of the Fourteenth Amendment does not require two-stage jury trials. In the instant case, the trial court, at the request of appellant, properly instructed the jury that it should not consider the prior conviction as any evidence of appellant's guilt on the charge of murder of Ms. Montgomery.
We also find no merit in appellant's claim that the use of the prior conviction as an element of the statutory capital offense and its use in sentencing constituted double jeopardy. Such statutes and other enhanced-sentence laws, including recidivist statutes, have been sustained on many occasions against contentions that they violate constitutional strictures dealing with double jeopardy, ex post facto laws, cruel and unusual punishment, due process, equal protection, and privileges and immunities. See, e.g., Gryger v. Burke,334 U.S. 728, 68 S.Ct. 1256, 92 L.Ed. 1683 (1948); Arthur v. State, supra; Hubbard v. State, supra; Wilson v. State, supra. The conviction and sentence in the instant case are not to be viewed as either a new jeopardy or additional penalty for the earlier crime. The present sentence is an enhanced penalty for the latest crime, which is considered to be an aggravated offense because it is a repetitive one. Gryger v. Burke, supra.
We find no denial of due process by the use of the prior conviction. The trial court's denial of appellant's motion to quash the indictment was proper.
 III
Appellant contends that § 13-11-2(a)(13) is unconstitutional on the ground that it *Page 1216 
constitutes a denial of equal protection of the law because the twenty-year period used in the statute is arbitrary. We addressed this exact issue on appellant's first appeal and ruled that the twenty-year classification is not unreasonable or arbitrary. Hubbard, 382 So.2d at 588-90. The Alabama supreme court agreed. Hubbard, 382 So.2d at 597. We adhere to our former ruling, as stated in Hubbard, 382 So.2d at 589:
 "The statute was obviously enacted with a view to the protection of society from a certain class of criminal with the belief that a hardened criminal needed more severe punishment than a first offender. Such statutes which enhance sentence are not violative of the due process clause, Graham v. West Virginia, 224 U.S. 616
[32 S.Ct. 583, 56 L.Ed. 917] . . . (1912); Moore v. Missouri, 159 U.S. 673 [16 S.Ct. 179, 40 L.Ed. 301] . . . (1895), and do not create an unreasonable classification. McDonald v. Massachusetts, 180 U.S. 311 [21 S.Ct. 389, 45 L.Ed. 542] . . . [1901]. Generally see 58 A.L.R. 20 (1929); 82 A.L.R. 345 (1933); 116 A.L.R. 209 (1938); 132 A.L.R. 91 (1941); 139 A.L.R. 673 (1942).
". . .
 "The essence of the theory of equal protection of the laws is that all similarly situated be treated alike. City of Hueytown v. Jiffy Chek Co. of Alabama, 342 So.2d 761 (Ala. 1977). Classification of subjects in a statute is not arbitrary and invalid if based on some difference which bears a reasonable and just relation to the attempted classification. Board of Com'rs of City of Mobile v. Orr, 181 Ala. 308, 61 So. 920 (1913).
 "We do not think it unreasonable to suggest that the legislature, faced with enacting the death penalty laws for this state, reasoned that it is not every prior conviction for murder which upon a subsequent conviction should be subject to the death penalty but only those which occur within a limited period of time. Indeed it could be argued that the very act of instituting the twenty year period was an affirmative and reasoned approach rather than merely including any prior conviction. Considering society's right to be protected from the depravity of the criminally inclined and the duty of the government to secure to its citizens the enjoyment of their lives and property against the unlawful aggression of the criminal class, we conclude that the classification is not unreasonable or arbitrary. Merely because the legislature could have created a different classification does not make the present one arbitrary."
We find no merit in this contention of appellant.
 IV
Appellant next contends that the trial court committed reversible error in denying him two jury strikes for each strike by the State.
Appellant was charged with having committed a murder in the first degree with aggravating circumstances on January 10, 1977. At that time, jury selection in Alabama in criminal cases was governed by § 12-16-100, Code of Alabama 1975, providing that in striking a jury, the defendant would strike two prospective jurors to the district attorney's one. On April 15, 1982, the statute was amended to provide, inter alia, that thereafter in selecting a jury to try a criminal case, both parties would alternately strike one venireperson; thus, a one-for-one strike system was implemented. 1982 Ala. Acts 267, No. 82-221 (effective April 15, 1982). The jury for the trial of the instant case was selected on April 19, 1982, after the one-for-one strike system had gone into effect, and was selected in accordance with the new system.
Appellant argues that the statute authorizing a two-for-one jury strike procedure in existence at the time of the commission of the offense constituted a substantive right, and that the application of the new statute providing for a one-for-one strike system in the instant case constituted an ex post facto application of the law in violation of the United States Constitution. We do not agree. Appellant concedes that the prior holdings of this court do not support his contention, and in effect he asks us to *Page 1217 
overrule our prior decisions. We decline to do so. It is well settled that such a statutory amendment is a procedural change, not a substantive change, and thus the jury selection in this case was properly governed by the statute in effect at the time of the trial. Holsemback v. State, 443 So.2d 1371
(Ala.Cr.App. 1983), cert. denied, 443 So.2d 1371 (Ala. 1984);Cofer v. State, 440 So.2d 1116 (Ala.Cr.App.), rev'd on other grounds, 440 So.2d 1121 (Ala. 1983); Robinson v. State,429 So.2d 682 (Ala.Cr.App. 1983); Terrell v. State, 429 So.2d 656
(Ala.Cr.App. 1982), cert. denied, 429 So.2d 656 (Ala. 1983);Robinson v. State, 428 So.2d 148 (Ala.Cr.App. 1982), cert. denied, 428 So.2d 148 (Ala.), cert. denied, 462 U.S. 1137,103 S.Ct. 3122, 77 L.Ed.2d 1374 (1983); Haynes v. State,424 So.2d 669 (Ala.Cr.App. 1982); South v. State, 86 Ala. 617, 6 So. 52
(1889). We find no merit in this contention.
 V
Appellant contends that his conviction under § 13-11-2(a)(13) violates his rights under the Eighth and Fourteenth Amendments of the United States Constitution and Ala. Const., art. I, § 15 (1901). He argues that the statute "can mandate a cruel and unusual punishment for a non-capital offense." He urges that it is cruel and unusual punishment when two non-capital offenses are considered together to make a capital offense.
We also addressed this issue in considering appellant's first appeal, and found no merit. Our supreme court agreed. We citedGregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859
(1976), wherein the United States Supreme Court, in considering whether the sentence of death for murder is a per se violation of the Eighth and Fourteenth Amendments, concluded that the infliction of death as a punishment for murder is not without justification and thus is not unconstitutionally severe.Hubbard, 382 So.2d at 588. In Hubbard, we stated:
 "The argument of the defendant ignores the fact that there is no constitutional barrier to the imposition of the death penalty for a single act of murder. Gregg, supra. In addition, the defendant was indicted and convicted not simply for 'an intentional killing' but for an offense involving first degree murder. Most of the aggravated offenses created by Alabama's Death Penalty Act involve an 'intentional killing' rather than first degree murder. In Ex Parte Clements, 370 So.2d 723
(Ala. 1979), the Alabama Supreme Court affirmed this Court's holding that under Section 13-11-2(a)(2) the indictment need not charge that the killing was done ' "unlawfully and intentionally and with malice aforethought" ' during the commission of a robbery as the statute only requires an 'intentional killing'."
382 So.2d at 588.
To support his argument, appellant relies on Coker v.Georgia, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977). InCoker the Court held that a sentence of death for the crime of rape of an adult woman is grossly disproportionate and excessive punishment forbidden by the Eighth Amendment as being cruel and unusual punishment. Coker can be clearly distinguished from the instant case. However, applying the principles set forth in Coker, as we did in appellant's first appeal, we find that the death penalty is not cruel and unusual punishment for the aggravated offense defined by § 13-11-2(a)(13).
Thus, we again find no merit to this contention.
 VI
Appellant's next contention is stated in his brief as follows:
 "DEFENDANT'S INTOXICATION AND CHRONIC ABUSE OF ALCOHOL RENDERED HIS STATEMENTS TO THE POLICE INVOLUNTARY AND INADMISSIBLE, AND THE OFFERING OF A DRINK TO THE DEFENDANT BY THE POLICE SERVED AS AN IMPERMISSIBLE INDUCEMENT TO SIGN A WRITTEN STATEMENT."
 A.
We will first address the question of appellant's alleged intoxication at the time *Page 1218 
of questioning. He claims that the State failed to meet its burden of proof in establishing the voluntariness of his statement. We disagree.
In order for intoxication to render a confession inadmissible, it must be shown that the mind of the defendant was substantially impaired when the confession was made.Moore v. State, 488 So.2d 27 (Ala.Cr.App. 1986); Moore v. State,415 So.2d 1210 (Ala.Cr.App.), cert. denied, 415 So.2d 1210
(Ala.), cert. denied, 495 U.S. 1041, 103 S.Ct. 459,74 L.Ed.2d 610 (1982), and cases cited therein. "Intoxication, short of mania or such impairment of the will and mind as to make an individual unconscious of the meaning of his words, will not render a statement or confession inadmissible." Tice v. State,386 So.2d 1180, 1185 (Ala.Cr.App.), cert. denied,386 So.2d 1187 (Ala. 1980). See also Palmer v. State, 401 So.2d 266, 268
(Ala.Cr.App.), cert. denied, 401 So.2d 270 (Ala. 1981), cert. denied, 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982).
The voluntariness of an alleged confession is a question of law addressed to the trial court, whose ruling will not be disturbed on appeal unless it appears to be contrary to the great weight of the evidence or is manifestly wrong. Tice v.State, supra; Garrison v. State, 372 So.2d 55
(Ala.Cr.App. 1979). The degree of intoxication which would affect the voluntariness of a statement is a question of fact initially addressed to the trial court and, depending upon its ruling, then to the jury for its consideration. Tice v. State, 386 So.2d at 1185.
Where ample evidence, even though conflicting, exists from which the trial judge could conclude that the appellant was not intoxicated to the extent of mania, the admission of a confession for a jury's consideration is not an abuse of discretion. Palmer v. State, supra; Rogers v. State,365 So.2d 322 (Ala.Cr.App.), cert. denied, 365 So.2d 334 (Ala. 1978).
In the instant case, Manley and Stephens, who were the first officers to arrive on the scene at approximately 8:53 a.m., testified that appellant had obviously been drinking alcohol. They based this observation upon his demeanor and the smell of his breath. He had a partially filled bottle of liquor on his person. Both officers testified, however, that in their opinion he was "not drunk." He cooperated with the officers, and with the ambulance drivers who had arrived earlier. He made telephone calls, ostensibly seeking advice as to what to do, and he asked the telephone operator to call the police and an ambulance. He was observed by neighbors around 5:00 a.m. and again at 6:00 a.m., when they helped him try to start Ms. Montgomery's automobile. These neighbors apparently did not observe anything unusual about his conduct. The questioning of appellant which led to the statement did not begin at police headquarters until 11:35 a.m. He had been in the presence of officers since 8:53 a.m. and had not had access to alcohol during that period of time. Prior to questioning, appellant was properly advised of his Miranda rights, and he signed a form acknowledging that he understood them. He waived his rights, including his right to have counsel present, and stated that he wished to make a statement. He made a statement, which was reduced to writing, and he read and signed it. Officer Marcum, who advised appellant of his rights and who took the statement from him, testified that he believed that the officers who were at the scene had told him that appellant had been drinking, but he testified that when he advised appellant of his rights and took his statement, appellant was not intoxicated and did not stagger or indicate in any way that he was intoxicated. Marcum testified that appellant was responsive to the questions asked him, did not slur his words, and appeared to be in control of his faculties. The detail and substance of the statement indicate that appellant had control of his mental processes and knew what he was doing. The evidence indicates that nothing was promised him and that he was not threatened or coerced in any manner. His statement fell short of being an outright confession, but, in view of the evidence developed in the case, it proved to be incriminating and very *Page 1219 
damaging to his interests. As has been pointed out, appellant did not testify at the hearing on the motion to suppress, nor at trial. The testimony of the officers concerning the sobriety of appellant and the circumstances surrounding the taking of the statement stands unrefuted. There was substantial credible evidence from which the trial judge could conclude that the statement was voluntary and was given with full knowledge and understanding of its consequences. There is no substantial evidence to support appellant's contention that his statement was inadmissible due to "intoxication and chronic abuse of alcohol." The trial judge's decision in admitting the statement into evidence was not contrary to the great weight of the evidence, and therefore should not be disturbed on appeal. We find no error here in admitting appellant's statement.
 B.
We next address the matter of Officer Marcum's giving appellant a drink of alcohol just prior to his signing his statement. Appellant contends that this was an impermissible inducement to get him to sign the statement. The record shows that after the statement had been given, appellant was afforded an opportunity to read it, which he did. It was also read to appellant by Marcum while appellant looked on. Appellant signed it on each page. As he was preparing to sign the statement, he said that his hand was shaking and he needed a drink to steady his nerves. Marcum allowed appellant to take a drink from the half-pint bottle which had previously been taken from appellant, and he then signed the statement. The record shows the following testimony from Marcum:
 "Q. When you talked to Mr. Hubbard at the homicide office, did he have any odor of alcohol about his person?
 "A. Yes, sir, I recall that he had an odor with the flavor of alcoholic beverages about him.
"Q. Now, what did you do with the bottle after?
 "A. It's at the office now. As I recall, I believe it's listed among the other items of evidence taken. It's in the property room at the homicide office.
 "Q. All right. Did it ever come back into the defendant's possession?
"A. Yes, it did.
"Q. When was that?
 "A. Oh, about the time he read his statement, when he went to sign the statement, he said he was so nervous that he could hardly write, and he asked me if he could have a drink, and I told him it was his whiskey, and I opened it — I let him have it, and he took a drink from it.
 "Q. All right. Do you recall how much of it he drank?
 "A. He took a pretty good — a couple of pretty good belts, as I recall.
 "Q. And this was as he was signing the statement then, is that correct?
 "A. Yes, sir, that's correct. He said he needed it to steady his nerves.
 "Q. Had there been any conversation about him getting anything to drink earlier than that?
 "A. No, sir, that's the first time he had said anything about it.
 "Q. All right. The odor of alcohol you had smelled about him, you had smelled it that morning, is that correct?
"A. Yes, sir.
 "Q. All right, Mr. Marcum, in that statement that you took from Mr. Hubbard, that statement was in response to questions you asked generally, is that correct?
"A. Some of it was, yes, sir.
 "Q. All right. And were you writing things down as Mr. Hubbard was speaking?
 "A. As I recall, we went through it in — he told me his version of it and I probably may have asked him questions and anything that I didn't understand and didn't know about, and then after that we went back over it again and I *Page 1220 
committed it to paper in writing, what he had told me."
Marcum further testified as follows:
 "Q. Now, I believe you stated on cross-examination that after he had given the statement to you, that he at that point asked for something to calm his nerves, a drink of whiskey, and at that point you gave it to him. Anytime prior to that, had he asked you for any of it, and you withheld it?
"A. No, sir.
"Q. Had he asked you for it at all?
"A. No, sir.
 "Q. Did you tell him that you would not give it to him unless he did sign or talk?
 "A. No, sir, I did not. It wasn't mentioned until he went to sign — said he was nervous when he went to sign it, and said — he asked me about having a drink of something to settle his nerves.
 "Q. All right. And what did you tell him when he did that?
"A. I told him it was his liquor.
 "Q. All right. Did you tell him that you were giving it to him so he would talk?
"A. No, sir, I did not.
"Q. So that he would sign the rights form?
"A. No, sir.
 "Q. So he would acknowledge the statement in any way whatsoever?
"A. Did not.
 "Q. Did at anytime, did he become in your judgment drunk?
"A. No, sir.
 "Q. He retained his coherence during the entire time this statement was taken?
"A. That's correct."
The trial court asked Marcum, "Mr. Marcum, let me ask you this. Did you hold the whiskey as an enticement to Mr. Hubbard to get him to make any statement?" Marcum answered, "No, sir, I did not." Marcum testified that appellant was not suffering from delirium tremens, but did appear to be nervous. Marcum's testimony is uncontradicted. Appellant may have had alcohol problems in the past, but there is nothing in the record to support his contention that he was induced to make or sign the statement in return for a promise of a drink of liquor.
Appellant's counsel makes much of the amount of liquor consumed from the bottle. He contends that it was full when appellant took the drink at the signing and that appellant must have drunk a half bottle. A reading of the entire record does not bear this out. The evidence tends to show that the bottle was not full when initially taken from appellant. Regardless of the amount consumed at the signing, we do not believe that it affected the voluntariness of appellant's acknowledgement of his statement by signature or that it was an inducement to the signing.
The question of improper inducement in obtaining admissions or confessions is determined by an examination of attending circumstances, with the inquiry focusing on whether the defendant's free will and rational intellect were overborne at the time he confessed. Rowe v. State, 421 So.2d 1352
(Ala.Cr.App.), cert. denied, 421 So.2d 1352 (Ala. 1982); Eakesv. State, 387 So.2d 855 (Ala.Cr.App. 1978).
Although we strongly disapprove of what Marcum did, we find, after examining all the attending circumstances, that there was no improper inducement that overbore appellant's free will and rational intellect at the time he made and signed the statement. We further find that the statement was clearly not the product of a direct or implied promise. The statement had been completed, all but the signing, when the conversation about the liquor arose, and, therefore, Marcum's acquiescence in appellant's taking a drink could not have induced the statement. No error was committed in admitting the statement into evidence.
 VII
Appellant contends that reversible error was committed by the trial court in its admission of evidence obtained as a result of a search of Ms. Montgomery's residence, where appellant lived. We fully addressed *Page 1221 
this issue in our opinion on appellant's first appeal and decided the issue adversely to appellant. Hubbard, 382 So.2d at 591-92. The Alabama supreme court agreed. Hubbard, 382 So.2d at 597.
Appellant argues that there is no evidence in the record that he invited the police into the residence and thereby consented to its search. He argues that the evidence shows that he did not voluntarily, intelligently, and knowingly consent to the search of the residence. No question is raised as to appellant's having an existing claim to possession in the premises. He was living at the store-residence with the victim and, for the purposes of this opinion, we will assume that he had standing to raise the issue. Therefore, if the search in this case is to be held valid, it must have been conducted with appellant's consent, for no other exception to the warrant requirement is applicable.
A person may waive his Fourth Amendment protection by consenting to a warrantless search. Schneckloth v. Bustamonte,412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). To introduce the evidence obtained in a consent search, the prosecution must establish that consent was fully and voluntarily given. Bumper v. North Carolina, 391 U.S. 543,88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). Under the Fourth Amendment, courts must examine the totality of the circumstances to determine the voluntariness of the consent. United States v.Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497
(1980); Schneckloth v. Bustamonte, supra; United States v.Alegria, 721 F.2d 758 (11th Cir. 1983). Factors relevent to this determination include the defendant's performance of cooperative acts, his age and intelligence, and the nature of the police behavior. United States v. Horton, 488 F.2d 374 (5th Cir. 1973), cert. denied, 416 U.S. 993, 94 S.Ct. 2405,40 L.Ed.2d 772 (1974).
The facts in the instant case are not in dispute. According to appellant's statement, he telephoned three people shortly after the shooting. He told each "what Lillian had done," and each told him to call an ambulance, and one told him to call the police. One of these people was his mother. After making those three calls, he called the telephone operator. In his statement, he tells of the conversation as follows:
 "Then I called the operator and she told me to call the police headquarters and she dialed them for me. I told her it was an emergency, the police department answered and said they would send the ambulance right on out there."
When the ambulance arrived at the scene, appellant was standing in the back door of the store-residence, motioning to the ambulance attendants. The attendants entered the store-residence and discovered Ms. Montgomery dead on the kitchen floor. One of the attendants asked appellant if he had touched anything, and he told them that he had "carried the gun upstairs." Appellant then voluntarily accompanied the ambulance personnel to the ambulance, and remained seated in the ambulance until the police arrived. When the ambulance attendants left the store, the door locked. When the police arrived shortly thereafter and found the door locked, they asked the whereabouts of the key. Appellant stated that he had the key and handed it to Officer Manley. Manley unlocked the door, and he and Officer Stephens went inside and saw the body of Ms. Montgomery. Shortly thereafter, Investigator Marcum, Coroner Mitchell, and State Toxicologist Britton entered the premises and conducted a search. Among other items, two empty shell casings were found in a wastepaper basket upstairs. That afternoon, after appellant had given a statement and an autopsy had revealed that the victim had been shot three times instead of twice, as the police had originally been led to believe, Marcum returned to the store-residence and retrieved a third empty shell casing from the upstairs wastepaper basket.
At the time of the homicide, appellant was approximately forty-six years old.
In discussing this issue in our opinion on the first appeal, we stated:
 "At the outset we recognize that there is no 'murder scene' exception to the rule that all searches without a valid warrant *Page 1222 
are unreasonable. Mincey v. Arizona, 437 U.S. 385
[98 S.Ct. 2408, 57 L.Ed.2d 290] . . . (1978).
 "The question of whether a consent to search is voluntary or the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances. Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 2047-2048 [36 L.Ed.2d 854] . . . (1973). Examining the facts in this case we conclude that the defendant did, in fact, consent to the search and that the search was not unreasonable. The totality of the circumstances indicates more than a mere submission to police authority which would be insufficient to establishing the requisite voluntariness for consenting to a search. Herriott v. State, 337 So.2d 165 (Ala.Cr.App.), cert. denied, 337 So.2d 171 (Ala. 1976).
 "At the pretrial hearing the defendant presented no evidence that his consent was involuntary. The evidence revealed that although he had been drinking he was not drunk. The defendant voluntarily gave the keys to the police and never once protested the search or his treatment at the scene. There is absolutely no evidence of deception or coercion exercised by the police in obtaining the keys. There is not even any evidence that the police demanded the keys but only that Officer Manley asked the defendant where the keys were. The defendant made several statements at the scene and made another statement at police headquarters. He freely admitted possession of the murder weapon (although he claimed that Mrs. Montgomery had shot herself) and the fact that he had taken the pistol upstairs after the shooting and removed 'two empty shells out of and put two more bullets in it'. He told the police that he had placed the empty shells in the trash. Following the homicide, the defendant gave every appearance of cooperating with the police though claiming that the killing was suicide.
". . .
 "The whole tenor of the defendant's conduct is one of cooperation with the willingness to aid the police. When the defendant gave the keys to Officer Manley he had previously told an ambulance attendant that he had carried the pistol upstairs. When Officer Manley first arrived he talked with the attendant in the defendant's presence. Under these circumstances, and in the absence of any conflicting evidence, it is reasonable to conclude that when the defendant handed the keys to the police officer he voluntarily relinquished all expectation of privacy. Although the case of Knight v. State, 50 Ala. App. 39, 276 So.2d 624, cert. denied, 290 Ala. 368, 276 So.2d 628 (1973), can be distinguished on its facts from the present case, we think that in principle they are the same. It is clear that the consent to search may be given on actions alone. Burrell v. State, 45 Ala. App. 664, 235 So.2d 913 (1970). In Burrell this Court held that where the defendant volunteered the whereabouts of a gun, there simply was no search and hence no warrant was required. 45 Ala. App. at 666, 235 So.2d 913. Here the defendant told the police where two shell casings were. The third casing was also in that same exact location. Consequently we uphold the search without a warrant as reasonable pursuant to the consent of the defendant."
382 So.2d at 591-92.
We further note that, as this court recognized in Bradley v.State, 494 So.2d 750, 764 (Ala.Cr.App. 1985), "[a] significant, but not controlling, factor to consider in examining the totality of the circumstances to determine voluntariness is whether or not the accused initiated the original contact with the police." For example, in Kelly v. State, 75 Wis.2d 303,249 N.W.2d 800 (1977) (cited in Bradley), the defendant called the police under circumstances implying that the victim had shot himself or had been shot by someone other than the defendant. In finding that the seizure of a gun, the shell within the gun, and the slug on the floor was not the result of an unconstitutional search because the search was *Page 1223 
made pursuant to the defendant's consent, the court found very persuasive the fact that the defendant initiated contact with the law enforcement personnel. It noted that "there was an implied consent not only to aid the victim but to determine what had caused the death or injury and who was responsible."75 Wis.2d at 313, 249 N.W.2d at 805. Likewise, in the case at bar, we find crucial the facts that appellant initiated the contact with the police by reporting that Ms. Montgomery had committed suicide, that he requested assistance, and that he was very cooperative with the authorities.
We reaffirm and adopt our opinion rendered on this issue in the first appeal. We find from the totality of the circumstances that appellant's consent to the search was freely and voluntarily given. We find again that the search without a warrant in this case was reasonable pursuant to the consent of appellant.
 VIII
Appellant claims that his initial statements made to the police officers at the scene prior to being read hisMiranda rights should have been suppressed and that the failure to suppress them constituted reversible error. Appellant argues that he was in custody when the pre-Miranda questioning occurred. The State disagrees, contending that the questioning was in the nature of the general on-the-scene investigative type.
Officers Manley and Stephens had been dispatched to the scene to investigate a report of a possible suicide. Upon arriving at the scene, they were given the key to the locked store-residence by appellant and they went inside, where they observed the scene and body of the victim. When the officers went back outside, Manley spoke with appellant, who had been waiting outside with the ambulance attendants. Officer Manley testified as follows:
 "Q. All right. And at that point, what, if anything, did you do?
 "A. I walked back outside to the patrol car and called for homicide, and the coroner.
 "Q. And at any time did you have any conversation . . . with the defendant, J.B. Hubbard?
"A. Yes.
"Q. And when and where was this?
 "A. It was after I came back outside and called homicide, and asked Mr. Hubbard what happened. And he stated to me that he had, that he and Mrs. Montgomery had been arguing upstairs in the bedroom, and that she had went downstairs, and he had heard what he thought were two shots.
 "Q. All right, sir. Now, when he stated that they were arguing, did he put any time reference to it or time frame as to when these arguments were taking place?
 "A. Yes, sir, he stated that they were approximately seven o'clock that morning.
"Q. All right, sir.
"A. Shortly thereafter is when he heard the shots.
". . .
 "Q. Did he make any statements to you concerning any firearms?
 "A. Well, after he told me that Mrs. Montgomery had been shot, I asked him where the gun was, and he told me that he had it on him.
 "Q. All right, sir. And at that point, what did you do?"
 "A. I frisked Mr. Hubbard and found the pistol in his right, back pocket.
"Q. And did you find anything else?
 "A. Yes, a box, a half a box of .38 cartridges and a pint bottle of Cabin Hollow whiskey.
 "Q. Okay. Now, at that time, what, if anything, did you do?
"A. I read Mr. Hubbard his rights."
After appellant had been read his Miranda rights and had acknowledged that he understood them, he repeated what he had previously told Manley. The record shows the following: *Page 1224 
 "Q. Did he make any statements to you after that, after you read him his rights?
 "A. The only — Yes, sir, he said that he and Mrs. Montgomery had been arguing the night before, and they had gotten up this morning, January 10, and were arguing, and she went downstairs and he heard what he thought were two shots, and he went down to check on her, and either called a friend or a relative and asked them what to do, that she was bleeding real badly. And I asked him why he waited so long to call the police or the ambulance. And he stated that he didn't know what to do, and that he had tried to call around.
 "Q. All right, sir. Now, did he make any statement to you concerning his actions before the ambulance attendants arrived on what he did after the shots were fired and before you all got there?
". . .
 "A. Only that he had tried to call a friend or relative to find out what to do. She was bleeding real bad, and that she had shot herself."
On cross-examination, Manley testified as follows:
 "Q. Now, when you went back out, you went directly to where Mr. Hubbard was standing, is that correct?
"A. Yes.
"Q. And you spoke with him, is that correct?
"A. Yes.
"Q. Now, at that time had he been read his rights?
"A. No, sir.
 "Q. And you got a statement from him about an argument at approximately seven o'clock that morning and Mrs. Montgomery leaving the bedroom and going downstairs, is that correct?
"A. Yes, sir.
 "Q. Officer Manley, was Mr. Hubbard free to leave at that time?
"A. No, sir.
 "Q. If he had tried to leave, what would you have done?
"A. I would have detained him.
 "Q. All right. Now, after he made that initial statement to you at the ambulance, what, if anything, did you do?
 "A. I asked him where the gun was, and he told me that he had it on him, and I searched him and got the gun and the shells and the whiskey, and I read him Miranda."
Police investigating reports of crime must generally rely on information given them by persons at or near the scene. These persons many times will not tell what they know without being asked by the officers. Miranda v. Arizona, 384 U.S. 436,86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), does not require special warnings to persons who are not under restraint. In Miranda,384 U.S. at 477-78, 86 S.Ct. at 1629, the Court stated:
 "General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present."
Interrogation has been defined by the United States Supreme Court as the express questioning or its functional equivalent, that is, words or actions on the part of the police which the police should know are reasonably likely to elicit anincriminating response from the suspect. Rhode Island v. Innis,446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Miranda
does not prevent traditional investigatory functions such as general on-the-scene questioning; general on-the-scene questioning of a suspect does not constitute interrogation for Fifth Amendment purposes. Miranda v. Arizona, supra; UnitedStates v. Scalf, 725 F.2d 1272 (10th Cir. 1984) (no interrogation when officer asked defendant ". . . what was going on, what the problem was?" soon after defendant had stabbed another inmate); Truex v. State, 282 Ala. 191,210 So.2d 424 (1968) (no interrogation when officer asked defendant *Page 1225 
"What happened?" at a homicide scene); Kelley v. State,366 So.2d 1145 (Ala.Cr.App. 1979); Harrison v. State, 358 So.2d 759
(Ala.Cr.App. 1977), rev'd on other grounds, 358 So.2d 763
(Ala. 1978). In Harrison, 358 So.2d at 761, we stated the rule as follows:
 "Miranda, supra, does not prevent traditional investigatory functions such as general on-the-scene questioning, but it does become operative where restraint of an individual by law enforcement personnel is 'significant.' United States v. Montos, 421 F.2d 215 (5th Cir. 1970), cert. denied, 397 U.S. 1022 [90 S.Ct. 1262, 25 L.Ed.2d 532]. . . . The dividing line between general investigation and custodial interrogation is not drawn with precise demarcation, but is determined on a case-by-case factual analysis. Brown v. Beto, 468 F.2d 1284 (5th Cir. 1972). Criteria used to determine the necessity of Miranda
safeguards include: probable cause to arrest, subjective intent of the police, subjective belief of the defendant, and focus of the investigation. Montos, supra. Especially important is whether the focus of the investigation had finally been centered on the accused. Brown, supra; DeGruy v. State, 56 Ala. App. 521, 323 So.2d 406 (1975), cert. denied, 295 Ala. 399, 323 So.2d 411."
After considering the facts of this case in the light of the principles set out above, we find that appellant was not in custody or under restraint when he made the statements to Manley prior to being given the Miranda warnings. The statements were made in the course of the officer's general investigation at the scene of the alleged suicide, and the questioning was investigative rather than accusative. At the time the officer asked appellant what had happened and inquired as to the whereabouts of the gun, the officer apparently had no intention to make an arrest; rather his apparent intent was to discover as much as he could about what had happened from the only witness on the scene. From reviewing the officer's testimony, we find that the officer did not have the subjective intent to detain appellant until after the statements in question were made and after the gun was seized and, at this point, he read appellant his Miranda rights. It is clear that the focus of the investigation had not centered on appellant when the initial questions were asked. Appellant initiated the call for the police and the ambulance and had given the key to the officers so they could enter the house. He had given every indication of forthrightness and cooperation with the officers. When making the initial statements in question, he had no reason to believe that he was under any restraint or about to be arrested. Nothing had happened up to that point which would put him on notice that he was under suspicion or the object of an investigation. The pre-Miranda statements given to Manley at the scene were properly admitted into evidence, since Hubbard was not in custody or under restraint at that time, and were the result of general on-the-scene questioning.
An obvious object of inquiry for the officer on the scene was the whereabouts of the gun. We believe that when appellant told Manley that the gun was on his person, Manley had the right to frisk him and seize the gun, along with the box of bullets and the bottle of liquor. We think Officer Manley acted instinctively to protect himself as well as others, especially since he observed that appellant had been drinking. In addition to being proper as on-the-scene investigation, the pre-Miranda question pertaining to the whereabouts of the gun would be permissible under the "public safety" exception to theMiranda rule. New York v. Quarles, 467 U.S. 649,104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). In discussing this question in NewYork v. Quarles, the Court stated:
 "The exception which we recognize today, far from complicating the thought processes and the on-the-scene judgments of police officers, will simply free them to follow their legitimate instincts when confronting situations presenting a danger to the public safety.
 "We hold that the Court of Appeals in this case erred in excluding the statement, *Page 1226 
'the gun is over there,' and the gun because of the officers' failure to read respondent his Miranda rights before attempting to locate the weapon."
467 U.S. at 659, 104 S.Ct. at 2633 (footnote omitted). We believe that the question concerning the gun and its seizure along with the other items on appellant's person was a part of the general on-the-scene investigation and was not accusatory in nature; however, we also believe that the inquiry about the gun and its seizure falls within the "public safety" exception to the Miranda rule enunciated in New York v. Quarles, supra.
 IX
The scope of our review in death cases is prescribed in A.R.A.P. 45A, as follows:
 "In all cases in which the death penalty has been imposed, the court of criminal appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
We have followed this standard of review in the case at bar and have found no plain error or defect in the proceedings.
We have also followed the requirements of Beck v. State, supra, in reviewing the instant case. In reviewing appellant's death sentence by the three-tiered analysis of Beck v. State, we make the following findings: First, appellant was convicted of murder committed by a defendant who had been convicted of murder in the first or second degree in the twenty years preceeding the crime, in violation of § 13-11-2(a)(13), Code of Alabama 1975. This offense is, by statutory definition and designation, a capital offense. Second, we take judicial notice that similar crimes are being punished capitally throughout this state. See, e.g., Arthur v. State, 472 So.2d 650
(Ala.Cr.App. 1984), rev'd and remanded, 472 So.2d 665 (Ala.), on remand, 472 So.2d 670 (Ala.Cr.App. 1985); Jackson v. State,459 So.2d 963 (Ala.Cr.App.), aff'd, 459 So.2d 969 (Ala. 1984), cert. denied, 470 U.S. 1034, 105 S.Ct. 1413, 84 L.Ed.2d 796 (1985). See also, Julius v. State, 455 So.2d 975 (Ala.Cr.App. 1983), aff'd, 455 So.2d 984 (Ala. 1984), cert. denied, 469 U.S. 1132,105 S.Ct. 817, 83 L.Ed.2d 809 (1985). We note that there was no co-defendant in the instant case. And, third, our independent weighing of the aggravating and mitigating circumstances convinces us that the sentence of death is appropriate in this case.
We find that no errors were committed during the sentencing-phase hearings which adversely affected appellant's substantial rights. After hearing evidence during the sentencing-phase hearing concerning aggravating and mitigating circumstances; after being properly instructed by the trial court as to the applicable law; and being correctly advised that if the mitigating circumstances outweighed the aggravating circumstances, the punishment would be life imprisonment without the benefit of parole, but that if the aggravating circumstances outweighed the mitigating circumstances, the punishment could be death; the jury returned a verdict fixing appellant's punishment at death.
Thereafter, the trial court held another hearing to aid the court in determining whether or not it would sentence appellant to death as recommended by the jury or to life imprisonment without the possibility of parole. In its findings of fact (see "Appendix" attached hereto and made a part of this opinion), the trial court found the existence of aggravating circumstances as follows: Conviction for the crime of murder in the second degree committed within twenty years prior to the commission of the offense giving rise to the instant case; the capital crime of murder in the first degree with aggravated circumstances was committed for pecuniary gain; and the crime was especially heinous, atrocious, and cruel. The trial court carefully examined the evidence for mitigating circumstances, and particularly examined it in the light of the mitigating circumstances delineated in § 13-11-7, Code of Alabama 1975, and found that no mitigating circumstances existed. *Page 1227 
Thus, the trial court found the existence of three aggravating circumstances and no mitigating circumstances. The trial court considered the aggravating circumstances, while noting the absence of mitigating circumstances, and, finding the aggravating circumstances sufficient to support the sentence of death recommended by the jury, sentenced appellant to death by electrocution. The findings and conclusions of the trial court are fully supported by the evidence in this case. There is no question as to the proof of the prior conviction of murder. The evidence strongly supports the conclusion that the present crime was committed for pecuniary gain. We find that the findings of the trial court that the crime was especially heinous, atrocious, and cruel are amply supported by the evidence. The physical evidence shows that the victim was alive for a time after the shot was fired into her mouth and that during this time she was lying on her back, bleeding profusely, on the kitchen floor. It is possible that she was conscious at this time. After she was shot in the mouth and had been bleeding for a short time, a shot was fired directly into the front of her skull, which in all probability caused instantaneous death. The evidence supports the conclusion that this fatal shot could not have been self-inflicted, but rather was administered by appellant. This act was conscienceless and pitiless and torturous. Kyzer v. State, 399 So.2d 330
(Ala. 1981); Julius v. State, supra. We concur in the finding of the jury and the trial court that death is the appropriate sentence in this case.
Notwithstanding the fact that the crime occurred before July 1, 1981, the effective date of the 1981 Act, we choose to also review appellant's sentence by the provisions of § 13A-5-53, Code of Alabama 1975. Our findings above fully comply with §13A-5-53(a). In compliance with § 13A-5-53(b), we find: (1) That there is no evidence that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) based on our independent weighing of the aggravating and mitigating circumstances, that the sentence of death is appropriate in this case; and (3) considering the crime committed and the defendant, that the death sentence is neither excessive nor disproportionate to the penalty imposed in similar cases.
We have carefully searched the record in both the guilt and sentence phases of Hubbard's trial, and we have found no error. It is our opinion that appellant received a fair trial and was ably represented by experienced counsel throughout the proceedings. Accordingly, appellant's conviction and sentence of death are due to be, and they are hereby, affirmed.
AFFIRMED.
All Judges concur.
 APPENDIX STATE OF ALABAMA VS. J.B. HUBBARD, DEFENDANT. IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT OF ALABAMA CASE NO. CC 77 180 ORDER OF THE COURT
In accordance with law, the Court held a hearing on May 7, 1982, to determine whether or not the Defendant would be sentenced to death in accordance with the verdict of the jury or be sentenced to life imprisonment without parole.
The Defendant was present with his attorneys, Honorable Douglas Hendrix and Honorable Michael Stilson. The State of Alabama was represented by Honorable Gerald Hudson, Assistant District Attorney.
Evidence was offered by the State and Defendant, and both sides were permitted to present argument as to whether the Jury's verdict should be accepted by the Court.
The Court finds from all of the evidence and the Jury's verdict that the Defendant *Page 1228 
was guilty and is guilty; and as stated at the presentation of the Jury Verdict, the Court adjudged the Defendant guilty of Murder in the First Degree with aggravating circumstances as charged in Count I of the Indictment. The Court further finds as follows:
FINDINGS OF FACT FROM THE TRIAL
On January 10, 1977, at approximately 8:15 A.M., an ambulance manned by attendants David Freeman and Ricky Lee, was dispatched to the residence-store combination of the victim, Lillian Montgomery, in connection with a reported shooting. Upon their arrival, some ten minutes later, they saw the defendant in the open doorway motioning for them to come inside. At that time the attendants entered the residence and found the body of Lillian Montgomery lying dead in a large pool of blood on the kitchen floor. The defendant then stated to David Freeman, when asked if he had moved anything, that he had "carried the gun upstairs," whereupon the attendants and the defendant went outside to the ambulance, locking the door behind them.
At approximately 8:53 A.M. Tuscaloosa Police officers Jack Manley and Charles Stephens arrived at the scene. Officer Manley was then informed that the residence was locked up, at which time he was given the door key by the defendant. Officers Manley and Stephens entered the kitchen and saw that Lillian Montgomery was dead and had apparently been shot more than once. Upon seeing the condition of the body the officers went back to their patrol car and radioed for a member of the Homicide Unit and the coroner to come to the scene.
While waiting on the homicide detective and coroner to arrive, Officer Manley asked the defendant where the gun was and the defendant informed officer Manley that it was in his possession. Officer Manley then frisked the defendant and found a pistol, a box of ammunition and a bottle of whiskey on the defendant.
Sergeant Dempsey Marcum arrived at the scene at approximately 9:15 A.M. Upon his arrival officer Manley went to Sgt. Marcum's car. While officer Manley was away from his and officer Stephens's patrol car, the defendant showed officer Stephens his billfold full of several bills of currency of undetermined values, and stated, "I'm not a Bum."
While still outside the residence officer Manley gave to Sgt. Marcum the items he had seized from the defendant. Sgt. Marcum checked the gun and found it to be fully loaded. Sgt. Marcum entered the residence, by which time coroner Earl Mitchell, along with state toxicologist Jim Britton, had arrived at the scene. Upon his entry, Sgt. Marcum observed the body and also that the kitchen was in somewhat of a state of disarray indicating that a struggle may have taken place. In relation to the victim, a bloody and broken portion of her lower dentures was found a short distance from her body and she was clutching her bloody upper dentures in her left hand.
One badly mutilated, spent projectile was found in the kitchen and two spent shell casings were found in a waste paper basket in the upstairs bedroom by Coroner Mitchell. Later, at the autopsy, a projectile was removed from the head of the victim, which, along with the two spent casings, was identified as having been fired from the gun removed from the defendant.
The body was removed to the morgue where Dr. Henry Santina performed the autopsy. Dr. Santina found three sets of wounds. One entrance with accompanying exit wound was found in the left shoulder passing from the victim's right to left. A second entrance wound was found in the victim's jaw. The projectile causing this wound passed from left to right, severely fracturing the victim's jaw, shattering her lower denture, cutting her tongue and then exiting. This wound caused severe bleeding of approximately three pints, according to coroner Mitchell. Dr. Santina testified that in his opinion the victim would not have been able to speak as a result of this wound and most probably was knocked unconscious. The third wound consisted of an entrance wound above the left eye. The projectile which caused this wound passed *Page 1229 
through the victim's brain and lodged at the base of the skull. This projectile caused death instantly and was recovered at the autopsy.
The defendant stated to Officer Manley that he and the victim had had an argument around 7:00 A.M. on the morning of the shooting, in the upstairs bedroom, and that the victim went downstairs at which time he heard two shots. However, when questioned by Sgt. Marcum that same day after having been informed of his constitutional rights under the Miranda decision, the defendant stated that he and the victim had been drinking during the night prior to the shooting and that around 2-3:00 A.M. he dozed off. The defendant stated that the victim went downstairs and he then heard two shots, whereupon he went downstairs and saw her lying on the floor; that he asked her, "What in the world have you done?" to which she replied, "I just wanted to leave and get out of the way, get on out of the way"; "that the last thing she said was to tell me, for me and Jimmy and Johnny to take care of what she had, and she said, you tell Jimmy and Johnny I want you to have my car. And she just passed out."
As noted earlier the evidence was conclusive that the victim was shot three times and that the final shot killed the victim instantly, thereby rendering impossible the conversation the defendant related to the officers and Sgt. Marcum.
Jim Britton, upon properly conducted tests, determined that the gun could not have been closer than fifteen inches and up to thirty-nine inches away from the victim when the shots were fired into her.
The defendant was alone with the victim at the time she was shot and killed.
Circuit Judge Fred W. Nicol, and Circuit Clerk, Doris Turner, testified and proved that the defendant was convicted of Murder in the Second Degree, within twenty years prior to the killing of Lillian Montgomery. This prior conviction for Murder occurred on October 10, 1957.
When the defendant was arrested and booked into the Tuscaloosa County Jail for the murder of Lillian Montgomery, he had on his person a gold with diamonds, wrist watch, of the value of between Four Hundred Dollars ($400.00) and Five Hundred Dollars ($500.00). This watch had been the personal property of the victim which she wore constantly, according to her sons. When found on the defendant, it had a broken band catch. On the morning of the murder, Jimmy Montgomery, the son of the victim, checked the cash register drawer at the victim's store and found it to be empty. When the defendant was booked at the jail, he was found to have a little over Five Hundred ($500.00) Dollars, on his person, about half of which was in checks made payable to the victim, and half of which was in currency and coin. The watch, money and checks were taken into possession of Sgt. Marcum. At the trial, Rosie Reeves testified that on the night before the killing the defendant told her he had no money.
FINDINGS OF FACT FROM SENTENCE HEARING
The Court heard from Olin Zeanah, a practicing Attorney of the Tuscaloosa Bar Association, who prosecuted the Defendant in the 1957 Murder Conviction. Mr. Zeanah testified to Mr. Hubbard's cooperation with the State in the prosecution of the co-defendant of Mr. Hubbard.
The Court received State's Exhibits 41, 42, and 43 and it is interesting to note the different stories Mr. Hubbard told concerning the Murder charge for which he was convicted in 1957. The Court notes with alarm the fact that the first killing was done by Mr. Hubbard upon the promise of money and that he engaged in a conspiracy at the time with one Divit Hubbard to kill two people.
Section 13-11-7, Code of Alabama, 1975, sets out mitigating circumstances to be considered by the trial judge in determining whether to commute to life in prison a death penalty imposed by a jury.
At trial there was no contention the defendant was operating under any mental or emotional handicap. Indeed, Mr. Hubbard *Page 1230 
offered an alibi, which he maintained throughout the trial demonstrated his innocence, and the jury was not persuaded. No consent by the victim to this brutal act was alleged, nor was the defendant shown to be an accomplice of any other person or under the influence of any other person. Beyond the fact of voluntary drinking of alcohol beverage, there was no pleading and no showing by the defendant that he was unable to appreciate the criminality of his conduct or conform his behavior to the requirements of the law. At the time of the crime the defendant was neither a tender youth nor a debilitated victim of aging. None of the mitigating circumstances delineated in § 13-11-7 have any application to this case, nor could the Court, on its own examination find any circumstances weighing in favor of the defendant and against the verdict of the jury. Therefore the Court finds that no mitigating circumstances existed.
As to circumstances aggravating the crime, they are as follows:
 1) The Court finds in aggravation that the Defendant had been convicted of Murder in the Second Degree, a felony involving the use of violence to the person. The Court notes that this conviction for Murder in the Second Degree was the aggravating circumstance alleged in Count I of the Indictment for which Defendant was convicted.
 2) The Court further finds that this capital felony of Murder in the First Degree with aggravating circumstances was committed for pecuniary gain, in that the evidence showed that the Defendant was without money on the night before the crime and that the Defendant when arrested had some Five Hundred ($500.00) Dollars on his person, some of which was in checks made payable to the victim, Lillian Montgomery. The evidence also showed that the victim's son, Jimmy Montgomery, on the day of the crime, checked the cash register till in victim's store and found it to be empty. The evidence further revealed that the Defendant had the victim's diamond watch on his person at the time of his arrest; said watch being identified by victim's son as being hers and valued at some Four Hundred ($400.00) Dollars. This watch was evidently forcibly taken from the victim's body as the catch was broken on the watch when it was recovered by the police.
 3) The Court further finds this capital felony of Murder in the First Degree with aggravating circumstances was especially heinous, atrocious and cruel. The evidence revealed that the victim was shot three different times, with some period of time elapsing between the last two shots. The evidence disclosed a large pool of blood surrounding the victim's head which was the result of a bullet wound to the mouth which shattered one of the victim's dentures. The victim then lay on the floor while her heart pumped the large pool of blood on the floor, then the third and final shot was fired which the testimony showed produced instantaneous death. The act and the means by which the Defendant accomplished it were indeed atrocious, heinous and cruel.
This Court finds all of those aggravating circumstances to be present in this case and finds them sufficient to support the sentence of death imposed by the Jury.
The Court finds that the capital felony of Murder in the First Degree with aggravating circumstances was committed by this Defendant in that the State proved beyond a reasonable doubt and to a moral certainty that the Defendant committed Murder in the First Degree with the aggravating circumstance that the Defendant had been convicted of Murder in the Second Degree within twenty years of the time that he committed the Murder in the First Degree made the basis of this prosecution.
THEREFORE, after listening to the evidence presented and the arguments of the able attorneys, and after weighing the aggravating circumstances presented by the State and noting the absence of any mitigating circumstances which would justify the Court's refusal to accept the death *Page 1231 
penalty as fixed by the Jury, it is therefore the order and judgment of the Court that the Jury's verdict of death be accepted in the manner and form provided by law.
Done this the 14th day of May, 1982.
 /s/ Claude Harris, Jr. Claude Harris, Jr. Circuit Judge, Presiding
 STATE OF ALABAMA VS. J.B. HUBBARD, DEFENDANT. IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT OF ALABAMA CASE NO. CC 77 180 ORDER OF THE COURT
After reviewing the evidence from the trial and the sentence hearing, and having weighed the circumstances, whether aggravating or mitigating, the Court fails to find sufficient reason to refuse to accept the death penalty as fixed by the jury. Therefore, the Court accordingly sentences the Defendant, J.B. Hubbard, to death by electrocution, and it is therefore considered and ordered by the Court, and is the judgment and sentence of the Court, that at Holman Penitentiary, on Friday, June 18, 1982, at any time before the hour of sunrise on that day, the Warden of Holman Penitentiary, or such other officer as may be authorized by law, shall execute the said Defendant, J.B. Hubbard, by causing to pass through his body a current of electricity of sufficient intensity to cause death, such current to be applied and to continue through his body until he is dead. It is further ordered by the Court that the Clerk of this Court shall issue the necessary warrant for the execution of the said Defendant as required by law. It is further ordered that this sentence be suspended pending the automatic appeal required by law. It is further ordered that an appeal to the Court of Criminal Appeals of Alabama be entered as required by law. It is further ordered that the Defendant, J.B. Hubbard, remain in custody during the pendency of the appeal, and that the Sheriff of Tuscaloosa County, Alabama, forthwith transport the Defendant to Holman Penitentiary and there deliver him to the custody of the Warden of Holman Penitentiary.
This the 14th day of May, 1982
 /s/ Claude Harris, Jr. Claude Harris, Jr. Circuit Judge
[1] The 1975 capital punishment statute, as contained in §§ 13-11-1 through 13-11-9, was, upon adoption of the new criminal code, effective January 1, 1980, recodified in identical language as §§ 13A-5-30 through 13A-5-38. These sections of the new criminal code were repealed effective July 1, 1981, by the 1981 capital offense statute, which applies only to conduct occurring on or after July 1, 1981; the repeal of §§ 13A-5-30
through -38 did not affect the applicability of those sections to conduct that occurred before July 1, 1981.